Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No: 18-CV-21953-JEM

CARELYN FYLLING,

    Plaintiff,

vs.

ROYAL CARIBBEAN CRUISES, LTD.,

    Defendant.

_____/

Craig H. Lichtblau, M.D., PA
550 Northlake Blvd.
North Palm Beach, Fl
February 18, 2019
6:00 P.M.

DEPOSITION OF CRAIG H. LICHTBLAU, M.D.

Taken before Andrea Denise West, Registered Professional
Reporter, Florida Professional Reporter and Notary Public
in and for the State of Florida at Large, pursuant to a
Notice of Taking Deposition filed in the above-styled
cause.

---

Page 2

```
 1    APPEARANCES:
 2
 3    ON BEHALF OF THE PLAINTIFF(S):
 4      ERIKSEN LAW FIRM
          BY: MICHAEL D. ERIKSEN, ESQUIRE,
 5          2161 Palm Beach Lakes Blvd., Suite 410
            West Palm Beach, Fl 33409
 6
 7
 8    ON BEHALF OF THE DEFENDANT(S):
 9
10      HORR, NOVAK & SKIPP, P.A.
          BY: JUAN C. PEREZ, JR., ESQUIRE,
11          Two Datran Center, Suite 1700
            9130 S. Dadeland Blvd.
12          Miami, Fl 33156
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 3

```
 1                    I N D E X
 2
 3    WITNESS:                              PAGE
 4    CRAIG H. LICHTBLAU, M.D.
 5    Direct Examination by MR. PEREZ        5
      Cross Examination by MR. ERIKSEN      101
 6
 7
 8
 9                 E X H I B I T S
10
11    _____        Description          PAGE
12    Defendant's 1  Notice of Deposition      5
13    Defendant's 2  Comprehensive Rehab Eval.      7
14    Defendant's 3  Dr. Dannenbaum's Report    8
15    Defendant's 4  Dr. Hudson's Report        9
16    Defendant's 5  Rebuttal Report            9
17    Defendant's 6  Peer-reviewed Articles     9
18    Defendant's 7  Patient's Chart           10
19    Defendant's 8  Medical Records           10
20    Defendant's 9  Invoice                   11
21    Defendant's 10 Elkins List               80
22    ***Defendant's Exhibits 1-9 to be copied and forwarded
23       to the Court Reporter for attachment.
24
25
```

---

Page 4

```
 1                 E X H I B I T S
 2
 3    _____        Description          PAGE
 4    Plaintiff's 1   What is a Physiatrist    105
 5    Plaintiff's 2   Article by Zotovas       107
 6    Plaintiff's 3   Article                  110
 7    Plaintiff's 4   Photograph               116
 8    Plaintiff's 5   Publication of the Mayo Clinic  119
 9    Plaintiff's 6   Journal                  123
10    Plaintiff's 7   Study                    128
11    Plaintiff's 8   Article                  134
12    Plaintiff's 9   Article                  136
13    Plaintiff's 10  Article                  141
14    Plaintiff's 11  Tator Article            143
15    Plaintiff's 12  Rebuttal Record          146
16    Plaintiff's 13  Journal                  147
17    Plaintiff's 14  Article                  148
18    Plaintiff's 15  Defrin Article           150
19    Plaintiff's 16  McMahon Article          151
20    Plaintiff's 17  Rabinowitz Article       151
21    Plaintiff's 18  Report of Treating Neurosurgeon 159
22    Plaintiff's 19  Article                  164
23
24
25
```

JEANNIE REPORTING (305) 577-1705

## Page 5

```
 1    Thereupon,
 2          CRAIG H. LICHTBLAU, M.D.
 3    after having been first duly sworn, was examined and
 4    testified as follows:
 5          DIRECT EXAMINATION
 6    BY MR. PEREZ
 7       Q   Doctor, good evening.  My name is Juan Perez.
 8    I represent Royal Caribbean in this case.  How are you?
 9       A   Good.
10       Q   First thing I'm going to do is I'm going to
11    attach the notice to this deposition as Defense Exhibit
12    1.
13           (Whereupon, Defendant's Exhibit No. 1
14           was marked for identification.)
15    BY MR. PEREZ
16       Q   Doctor, I take it you've received a copy of
17    this notice?
18       A   Yes.  The girls have been instructed to bring
19    everything here that we have.
20       Q   Since I don't want to take all night, did you
21    take a look at the schedule A that was attached to the
22    notice or did your staff?
23       A   I didn't, but the staff did.  Whatever -- we
24    try to comply with everything so I have everything here
25    that that asked for.  We don't create things, but
```

## Page 6

```
 1    whatever it asks for and we have it, we bring it.
 2       Q   Is there anything off the top of your head
 3    that you know that you do not have with you here today?
 4       A   Let me see.  I don't have No. 4, seminars,
 5    publications, articles, published or given by your
 6    company.
 7       Q   Well, let me ask you this:  Would your CV
 8    contain all of that information in it?
 9       A   All of it.
10       Q   Okay.
11       A   I mean, basically you have everything here
12    because it's all in my report or in my CV, and I gave
13    you my Elkins list for the last five years.  I think
14    it's greater than five years.  And then I have all the
15    peer-reviewed articles.  No. 17 is actually in the
16    report too.
17       Q   No. 17 is the articles that you reviewed for
18    this case?
19       A   Yes.
20       Q   And they're included in the comprehensive
21    rehabilitation evaluation that you have in front of
22    you?
23       A   Yes.  Then I did a rebuttal opinion.  I got
24    some more articles but they're here.  They're here.
25       Q   Okay.
```

## Page 7

```
 1       A   Basically everything that I have is here.
 2       Q   Now, I know what you have in front of you is
 3    your file copy, but I would like to mark it as Defense
 4    Exhibit 2.
 5       A   That's fine.  And then you'll just ask the --
 6    if you fill out that form there, we'll make a copy of
 7    anything you want.
 8           THE REPORTER:  Do you want me to put a
 9    sticker on it?
10           MR. PEREZ:  Sure.
11           THE REPORTER:  That way she knows what
12    Exhibit 2 is.
13    BY MR. PEREZ
14       Q   So I'm marking as Defense Exhibit 2 the
15    comprehensive rehabilitation evaluation.  It says file
16    copy on the top for this Plaintiff, Carelyn Fylling.
17    It's got some tabs.  I think there are, it looks like
18    13.  Would you agree?
19       A   Yes.
20           (Whereupon, Defendant's Exhibit No. 2
21           was marked for identification.)
22    BY MR. PEREZ
23       Q   You've got some other papers there with you.
24    Can you just tell me what that is?
25       A   One is the rebuttal opinion.  The other one
```

## Page 8

```
 1    is the records.  The other thing is the chart which has
 2    got medical records in it that you already have.  These
 3    are some articles having to do with concussion --
 4    post-concussion syndrome.  Also the neuroscience report
 5    from Dr. Brian Hudson, the treating neurosurgeon.  And
 6    then your defense IME doctor, I just got his report.
 7       Q   Dr. Dannenbaum?
 8       A   Yeah, Dr. Dannenbaum, yes.
 9           MR. PEREZ:  I would like to just go ahead
10    and mark all of those things.
11           THE WITNESS:  All right.  So why don't we
12    separate this.  Mark Dannenbaum as this one.
13    And then here is the report, December 14,
14    2018, from Dr. Hudson.  So here is one.  Let
15    me get a paperclip.
16           MR. PEREZ:  So Dr. Dannenbaum's report
17    we'll mark as Defense Exhibit 3.
18           (Whereupon, Defendant's Exhibit No. 3
19           was marked for identification.).
20           THE WITNESS:  All right.  That's that.
21    My rebuttal opinion and then these are some
22    peer-reviewed published articles.  I don't
23    know if you want them.
24    BY MR. PEREZ
25       Q   What you just handed to me is Dr. Hudson's
```

## Page 9

1  report?

2     A  Correct.

3     MR. PEREZ:  I'll mark that as Defense 4.

4     (Whereupon, Defendant's Exhibit No. 4

5  was marked for identification.)

6     MR. PEREZ:  Your rebuttal report, let's

7  go ahead and mark that as Defense 5.

8     (Whereupon, Defendant's Exhibit No. 5

9  was marked for identification.)

10  BY MR. PEREZ

11    Q  The rebuttal report, as I understand it, was

12  written after you read Dr. Dannenbaum's report,

13  correct?

14    A  Yes, of course.  Correct.  And then you want

15  these peer-reviewed articles?

16    Q  Yes, sir.

17    A  All right.  Here you go.  Here's a stack of

18  peer-reviewed articles.  This would be what, No. 6?

19     MR. PEREZ:  This will be No. 6.

20     (Whereupon, Defendant's Exhibit No. 6

21  was marked for identification.)

22     MR. ERIKSEN:  Can I see those?

23  BY MR. PEREZ

24    Q  Then you've got a manila folder?

25    A  Yeah.  This is the patient's chart.  This is

## Page 10

1  where all of this stuff lives.

2     MR. PEREZ:  Okay.  I'll mark that as 7.

3     (Whereupon, Defendant's Exhibit No. 7

4  was marked for identification.)

5     THE WITNESS:  Did you get this?

6     MR. PEREZ:  I'll mark that in a second.

7  Mike, have you had a chance to review this?  I

8  don't know if there's any correspondence or

9  anything like that.

10     MR. ERIKSEN:  Let me -- I'll look at it.

11     MR. PEREZ:  Okay.

12  BY MR. PEREZ

13    Q  And Defense Exhibit 8 will be part 2 of the

14  comprehensive rehabilitation evaluation which I believe

15  you testified earlier is the medical records you

16  reviewed?

17    A  Yes.

18     MR. PEREZ:  Okay.  I'll mark that as

19  Defense Exhibit 8.

20     (Whereupon, Defendant's Exhibit No. 8

21  was marked for identification.)

22  BY MR. PEREZ

23    Q  Have we marked everything?

24    A  Yes.

25    Q  I guess what we'll do, since these are all

## Page 11

1  your file copies, we'll arrange to have it all copied.

2    A  The court reporter knows what she can take

3  and what she can't take.  Right?

4     THE REPORTER:  Basically, I don't take

5  anything.

6     THE WITNESS:  Right, but just tell him.

7     THE REPORTER:  Yeah, I did.

8  BY MR. PEREZ

9     MR. PEREZ:  And earlier when you first

10  came in, you also gave me a stack of papers

11  which we'll mark as Defense Exhibit 9.

12     (Whereupon, Defendant's Exhibit No. 9

13  was marked for identification.)

14  BY MR. PEREZ

15    Q  So Defense Exhibit 9, the very top page

16  appears to be -- is this an invoice?

17    A  Yes.  That's what I charged Mr. Eriksen for

18  doing this.

19    Q  Okay.  So it's titled comprehensive

20  rehabilitation evaluation, and it talks about -- it

21  lists the things that you did in this case; is that

22  right?

23    A  It's all of this.

24    Q  Okay.

25    A  Which is Exhibit No. 2.

## Page 12

1    Q  So this refers to Exhibit No. 2, which is the

2  comprehensive rehabilitation evaluation?

3    A  Right.  That's the bill to do this.

4    Q  Understood.  All right.  And the date on this

5  is November 30, 2018, but I believe you saw Ms. Fylling

6  in October of 2018; is that right?

7    A  Right.  It usually takes four to eight weeks

8  to put this together.

9    Q  Okay.  When you say to put this together,

10  you're referring to the entire report?

11    A  Yes, because I had to call treating

12  physicians.  I spoke to Dr. Hudson on December 7th.

13    Q  Okay.

14    A  Spoke to Dr. Brian Hoh on November 13th.

15  Spoke to Antoinette Dakouny on November 13th.  Spoke to

16  Steven Pollard on November 14th.  Spoke to Jody Abrams

17  on November 13th.  So to put this together, the records

18  review and the history and physical, put everything

19  together, it's usually four to eight weeks.

20    Q  Understood.  And this top page of Defense

21  Exhibit 9 is on Craig Lichtblau, M.D., P.A. letterhead,

22  correct?

23    A  Correct.

24    Q  And underneath here -- I've deposed you in

25  the past so I know that you're a physiatrist and you're

Page 13

1   board certified in physical medicine and
2   rehabilitation, but I don't believe I've seen this one
3   before.  Brain injury medicine board certified?
4       A   September 24, 19 -- 2018 I passed my boards.
5   I am now double boarded.
6       Q   That makes sense.
7       A   I'm 62 years old.  That'll be the last board
8   exam I ever take.
9       Q   Can you just explain to me what brain injury
10  medicine is in your own words?
11      A   Everything to do with brain injury, and
12  everything is fair game.  The examination is seven and
13  a half hours.  It's 280 questions.  It's a national
14  board exam in PM&R.
15          THE REPORTER:  In what?  National board
16  exam what?
17          THE WITNESS:  In physical medicine and
18  rehab established by the American Board of
19  Physical Medicine & Rehabilitation.  And I was
20  competing against people half my age.  I
21  believe there are some requirements you have
22  to have X number of years of experience, which
23  I knew I had, because I've been out almost 30
24  years.  And you have to have -- I think 25
25  percent of your practice has to be brain

Page 14

1   injury, which mine is.  So I applied for the
2   boards.  I got granted permission to take
3   them.  I took them and I passed them.  It just
4   goes to show even a broken clock is right
5   twice a day.
6   BY MR. PEREZ
7       Q   Okay, Doctor.  Are you a neurosurgeon?
8       A   No.
9       Q   Are you a neurologist?
10      A   No.
11      Q   Are you a neuropsychologist?
12      A   No.
13      Q   Are you a neuro-ophthalmologist?
14      A   No.
15      Q   To get this brain injury medicine board
16  certification, first of all, is there more than one
17  organization that grants board certifications?
18      A   The way you've asked the question, sure,
19  there's board certification in orthopedic surgery,
20  pediatrics, OB/GYN.  Every specialty has board
21  certification, and some specialties have subspecialty
22  boards.  My particular specialty has subspecialty board
23  certification in brain injury, spinal cord injury,
24  pediatrics, and I think sports, and I think EMG nerve
25  conduction studies.  For sure in certain brain

Page 15

1   injuries, spinal cord injuries and peds, I know that to
2   be factual.
3           There are some other new boards popping up.
4   I met the criteria.  I passed the exam.  I'm board
5   certified in brain injury medicine, which means that I
6   am competent, overly competent to talk about brain
7   injury medicine because in order to become board
8   certified in physical medicine and rehabilitation, you
9   have to have a competent level of understanding of
10  neurosurgery, orthopedic surgery, adult, pediatric,
11  rheumatology, radiology, urology, internal medicine.
12  If you don't have a competent understanding of those
13  specialties in medicine, you cannot get board certified
14  in physical medicine and rehabilitation.  Because I
15  have extensive knowledge, training, and experience in
16  brain injury medicine, I applied to take the boards, I
17  passed them, and I have my subspecialty boards in brain
18  injury medicine.
19      Q   Okay.  I believe you just told me that was
20  September 24, 2018?
21      A   Right.  I just took the exam.  That board is
22  good for ten years.  That'll -- I'll be 72 years old.
23  That'll be the last board I ever take.
24      Q   Have you previously tried taking that board?
25      A   Never.

Page 16

1       Q   Would you agree that your practice focuses
2   more on rehabilitation?
3       A   You haven't asked the question right.  The
4   answer is no.  My specialty is physical medicine and
5   rehabilitation.  My specialty is -- and I'm not trying
6   to be evasive or a smart aleck.  My specialty is brain
7   injury, spinal cord injury, stroke, amputation, burns,
8   multiple orthopedic trauma, and musculoskeletal
9   medicine and pain management.  I have taken that to the
10  mat.
11          My practice has over 6,500 admissions to a
12  level one trauma hospital, over 3,000 intensive care
13  unit consultations, over 38,000 outpatients, and I'm in
14  a nonsurgical specialty but I have surgical privileges
15  at a level one trauma hospital and have surgical
16  privileges -- I work with Dr. Paley as a surgical
17  assistant.
18          My area of interest is congenital femoral
19  deficiency, rotationplasty, congenital pseudarthrosis
20  of the tibia, surgical treatment of such and osseous
21  integration.  These pictures are on the wall that's in
22  the operating room.
23          So my practice is extremely varied and my
24  practice is extremely busy, and I don't think too many
25  people have a practice similar to mine, and the

Page 17

1    foundation for that opinion is, I was the president of
2    the Southern Society of Physical Medicine in 2006,
3    which is the bottom 13 states, and I am currently the
4    president of the Florida Society of PM&R, and I kind of
5    have a handle on what's going on in the State of
6    Florida, and there is nobody that has the type or the
7    velocity of my practice.  It just doesn't exist.
8          I've been working in excess of a hundred
9    hours a week since September 22, 1989, and I have done
10   things in brain injury that have ended up on national
11   TV.
12   Q.   Okay.  So let me rephrase the question then.
13   In terms of when you see a patient, is it because
14   another doctor has referred the patient to you?
15   A.   No.  That's not true.  Physical medicine and
16   rehabilitation, we get patients that come in off the
17   street or my biggest referral source is not doctors or
18   lawyers.  My biggest referral source is patients, and
19   that's because my father was the third orthopedic
20   surgeon from Vero Beach to Fort Lauderdale.  When I
21   came home and opened my practice September 22, 1989, he
22   moved his office and moved 169,000 files.
23         I have patients that come in off the street,
24   and my neurology background is exceedingly strong, and
25   I diagnose ALS, MS, you know, TIAs, stroke.  I am every

Page 18

1    much of a primary care physician when it comes to
2    musculoskeletal medicine and catastrophic injury than a
3    neurosurgeon, an orthopedic surgeon, a neurologist
4    because I have hospital privileges and practice in the
5    hospital, and I have outpatient privileges, and I
6    practice in the outpatient setting.
7          I am not an orthopedic surgeon.  I am not a
8    neurosurgeon.  I am not a neurologist.  But if you're
9    going to practice physical medicine and rehabilitation
10   in the outpatient setting and, more importantly really
11   in the inpatient setting, you really have to have an
12   understanding of neurosurgery, orthopedic surgery,
13   neurology, and internal medicine.  Otherwise, you
14   really cannot take care of that patient population,
15   brain injury, spinal cord injury, stroke, amputation,
16   and burns, in the hospital setting.
17   Q.   In terms of brain injury, I know that you do
18   other things in your practice, but in terms of brain
19   injury, what percentage of the time are you diagnosing
20   a patient with a brain injury versus treating them here
21   in your practice after they've already been diagnosed?
22   A.   Well, when you say in your practice here,
23   this is an outpatient setting.  Also realize, we have
24   inpatient too.  I see brain injury -- I saw four of
25   them this morning in the hospital in the intensive care

Page 19

1    unit.  The patient's already been diagnosed with brain
2    injury, but in my history and physical, I'm also going
3    to diagnose them as brain injury.  So in the hospital
4    setting I see brain injury, in the outpatient setting I
5    see brain injury.  Overall, the best answer to your
6    question, I think 25 percent of my time is brain
7    injury.
8    Q.   Okay.  What percentage of the time are you
9    the only doctor diagnosing brain injury?
10   A.   Small, but it does happen.
11   Q.   What percentage of the time are you the first
12   doctor to diagnose brain injury?
13   A.   Small.  It does happen.  Because realize,
14   there's mild, moderate and severe.  The severe comes
15   through the emergency room.  I'm not the first guy on
16   the scene.  But patient comes in here all the time with
17   concussions which is considered a mild traumatic brain
18   injury, and I'll be the first one to diagnose it.  But
19   obviously, severe traumatic brain injury, I'm not the
20   first one to diagnose it because that's usually EMS,
21   emergency room physician, trauma surgeon, neurosurgeon,
22   before I get to it.
23   Q.   Would you agree the physiatrists normally
24   coordinate patient care with other doctors and
25   specialists in their fields?

Page 20

1    A.   Well, they can.  I mean, they can.  If I
2    admit somebody to an inpatient rehab unit, I'm also
3    actively -- let me explain something.  We have an
4    inpatient rehab unit, our level one trauma hospital.
5    Technically it's a separate hospital within the
6    hospital, and when I admit that patient, I have to make
7    the diagnosis of TBI, traumatic brain injury.  So the
8    way you've asked the question, I also have to make that
9    diagnosis.
10   Q.   Okay.  When it comes to the comprehensive
11   rehabilitation evaluations, have you previously
12   testified that 99.9 percent of the time that you're
13   preparing those, it's because of a litigation?
14   A.   Yes.  This is usually forensic report.  I
15   have done a couple for the State.  Actually, with CMS,
16   but it's very rare that it's not litigation, you know.
17   Q.   Okay.  And you saw Ms. Fylling on October 3,
18   2018; is that right?
19   A.   Yes.
20   Q.   And at the time that you saw her, you were
21   aware that there was a lawsuit pending?
22   A.   Yes.  This is a litigation report for the
23   purpose of litigation, yes.
24   Q.   Okay.  So you did not establish a
25   doctor/patient relationship with her on that date?

Page 21

1    A   Well, according to the AMA, you have a quasi
2  relationship.
3    Q   Okay.
4    A   But if you're asking me am I a treating
5  physician, the answer is no, I'm not a treater.
6    Q   Okay.  Do you intend to see Ms. Fylling
7  again?
8    A   It depends when the litigation goes.  If the
9  litigation takes a long time to go, I would recommend
10 to Plaintiff Counsel to have me reevaluate the patient.
11 If the litigation moves forward relatively quickly, I
12 have no reason to see the patient again.
13   Q   As of February 18, 2019, today, have you made
14 that recommendation to Mr. Eriksen?
15   A   No, but Mr. Eriksen knows that, you know, if
16 the litigation doesn't go forward, I'm sure he is going
17 to want -- just to have accuracy, I'm sure he's going
18 to want me to, you know, evaluate the patient again.
19   Q   All right.  Does Ms. Fylling have any
20 appointments with your office?
21   A   No.  At this point, absolutely not.
22   Q   Was Ms. Fylling referred to you by
23 Mr. Eriksen?
24   A   Yes.
25   Q   How did she get to your office?  Did she

Page 22

1  drive?
2    A   I don't know.
3    Q   Did she come alone?
4    A   I can't remember.  I don't know.  I don't
5  want to give misleading testimony.  I just don't know.
6    Q   No problem.  When you saw her, was she
7  walking with a walker or a cane?
8    A   I can't remember.  Whatever is documented in
9  my file.
10   Q   Okay.  Who paid you for that visit on
11 October 3, 2018?
12   A   Mr. Eriksen.
13   Q   And prior to seeing Ms. Fylling October 3,
14 2018, had you ever seen her before?
15   A   No.
16   Q   Had you ever treated her before?
17   A   No.
18   Q   Going back to Defense Exhibit 9, it looks
19 like you charged Mr. Eriksen $5,000 for review of
20 patient records?
21   A   Yes.
22   Q   And you charged $600 for a comprehensive
23 medical evaluation?
24   A   Yes.
25   Q   That's separate from the preparation of the

Page 23

1  report?
2    A   Yes.
3    Q   What would you describe as the comprehensive
4  medical evaluation?  What is that?
5    A   That's just the H & P.
6    Q   What is H & P?
7    A   History and physical.
8    Q   Okay.
9    A   That's the first section.  The next section
10 is the medical functional capacity assessment.  That's
11 $600.  The functional assessment is free.  Continuation
12 of care is billed at $750 an hour.  The summary report
13 is standard $400.  Then the photographs are $5 apiece.
14   Q   Why was a functional assessment free?
15   A   It takes two seconds for me to do it.
16   Q   And the phone conferences and correspondence
17 was .5 hours.  Are you referring to phone conferences
18 and correspondence with Mr. Eriksen?
19   A   No, no, no.  The lawyer doesn't count.
20 Dr. Brian Hudson, Dr. Brian Hoh, Dr. Antoinette
21 Dakouny, Steven Pollard and Jody Abrams.
22   Q   Okay.  It looks like in total here what you
23 charged Mr. Eriksen was $9,086; is that right?
24   A   Yes.
25   Q   And that was a prepayment retainer of 5,000?

Page 24

1    A   Yes.
2    Q   Which he paid you, correct?
3    A   Yes.
4    Q   So there's a final amount due of $4,086?
5    A   He didn't pay it?
6        MR. ERIKSEN:  I did pay it.
7        THE WITNESS:  He paid it.
8  BY MR. PEREZ
9    Q   Is that current through February 18, 2019?
10   A   Yeah, that's for everything, except this
11 deposition which you're paying for.
12   Q   All right.  You have a line in here, review
13 of report, one hour at $500 an hour.  What report is
14 that?
15   A   This report.
16   Q   So to review your report, you charged him
17 $500?
18   A   Yes, because I'm the X checker, and I have to
19 put everything in order to make sure everything is
20 correct.  There's a lot to this.
21   Q   Earlier we talked about the fact that you
22 drafted a rebuttal report, right?
23   A   Yes, that's something different.
24   Q   Has that been added to Mr. Eriksen's bill?
25   A   No, I don't think I charged for that.

Page 25

1    Q  So you're not charging him for that?
2    A  I don't think so.
3       THE WITNESS:  Mr. Eriksen, did we give
4    you a bill on that?  I don't think we did.
5       MR. ERIKSEN:  I don't think I've seen one
6    yet.
7       THE WITNESS:  I don't think I -- I don't
8    think I'm going to bill him for that.
9  BY MR. PEREZ
10   Q   What about for reviewing Dr. Dannenbaum's
11   report?
12   A   I did review it.  I'm not going to bill him
13   for that.
14   Q   And if you testify at trial in this case, how
15   much do you charge per hour?
16   A   $750 portal-to-portal.  And if I have to
17   spend the night, I do not charge for sleep and I do not
18   charge for food, and my max charge is 16 hours a day
19   because that's my normal work day, is 16 hours.
20   Q   Just for the record, where are we right now?
21   A   We're in my office.
22   Q   In terms of the city?
23   A   In North Palm Beach, Florida.
24   Q   And do you have an understanding that this
25   case, should it proceed to trial, is in Miami-Dade?

Page 26

1    A  I don't know where it is, but I would have to
2    go down there.
3    Q   Okay.
4    A   If it's during the day, if it's during the
5    day I now take the Brightline because, you know,
6    fighting traffic to go down there is terrible.
7    Q   Okay.
8    A   I get on the Brightline.  I go down there.  I
9    do my testimony.  I get on Brightline and come home.
10   Q   Understood.  So for something like that,
11   you're not going to charge to spend the night, are you?
12   A   No, not if you can get me on and off in the
13   same day.  Usually he's pretty good about that.
14   Q   So is there a 16-hour minimum charge?
15   A   No.  It's portal-to-portal, but if I have to
16   spend the night, I'm not going to charge him 20 hours.
17   I'm only going to charge 16 hours.
18   Q   Portal-to-portal, can you just explain what
19   do you mean by that?
20   A   From the time I leave either my house or my
21   office, get to Miami, testify then come back.
22   Q   And for purposes of today's deposition, do
23   you know how much you charged me?
24   A   Three hours.
25   Q   Okay.  Do you know how much that comes to?

Page 27

1    A  $750 an hour for three hours.
2    Q   Do you have any intent of billing Mr. Eriksen
3    anything further in this case?
4    A   Well, if I do more work, I will.
5    Q   Do you have any intent as you sit here right
6    now of doing anymore work?
7    A   I don't think so, unless it goes to trial.
8    I'll have to prepare for trial because rumor has it,
9    you're a really good defense attorney.  I better
10   prepare.
11   Q   Maybe not me, but my boss sure is.
12      MR. ERIKSEN:  You are too.
13      MR. PEREZ:  Thanks, Mike.  Make sure to
14   tell Dave that when my review comes.
15      MR. ERIKSEN:  That's on the record.
16   That's on the record.
17  BY MR. PEREZ
18   Q   And Defense Exhibit 9, you've also given me
19   your CV; is that right?
20   A   That's correct.
21   Q   Is this CV current as of today?
22   A   Yes.
23   Q   All right.  And we've already marked your
24   report.  Can you tell me what exhibit number that was?
25   A   Exhibit No. 2.

Page 28

1    Q  So Defense Exhibit No. 2 is your full report,
2    correct?
3    A   Correct.
4    Q   All right.  Other than the rebuttal report we
5    talked about, did you draft any other reports in this
6    case?
7    A   No, just this and that's it.
8    Q   Were there any draft reports that were later
9    changed?
10   A   Well, I dictate on the first grade, second
11   month level.  I mean, I gotta clean it up.
12   Q   Understood.  All right.  Did Ms. Fylling
13   review the report prior to its finalization?
14   A   I don't know.  I don't think so.  Not from
15   me.  I don't know if Mr. Eriksen showed it to her.  I
16   never showed it to her.
17   Q   Did you show the report to Mr. Eriksen prior
18   to it being finalized?
19   A   I don't remember.  I might have, but I don't
20   think so.
21   Q   Is that part of your ordinary practice?
22   A   No, unless it's complicated and it's in a
23   different state.  Like brain damaged baby case in
24   Chicago, they don't want any impairment ratings and
25   stuff like that.  Attorneys are not allowed to change

Page 29

```
 1   anything.  They can't change substance.  Impairment,
 2   disability, cost for future medical care.  They can
 3   take a section out, but they can't muddle with my
 4   opinions.  That's not happening.
 5       Q   Okay.  Do you have an understanding as to
 6   what Ms. Fylling's background is?
 7       A   Yeah, she is a nurse and she does legal
 8   reviews.  It's kind of sophisticated stuff.
 9       Q   So she has medical training?
10       A   Oh, yeah.
11       Q   And you don't know if she reviewed her
12   report?
13       A   She didn't do it with me.  I don't know what
14   Mr. Eriksen did, but she didn't do it with me.
15           MR. ERIKSEN:  Mr. Eriksen didn't do it so
16   there you go.
17           THE WITNESS:  I just don't want to give
18   misleading testimony.  That's all.
19   BY MR. PEREZ
20       Q   All right.  Doctor, in your practice have you
21   ever heard of the term symptom magnification?
22       A   Yes.
23       Q   What is that?
24       A   A liar.
25       Q   Is it described as anything else?
```

Page 30

```
 1       A   Well, other people describe it other ways.
 2   You're asking me how I describe it.  I think it's
 3   somebody who's actually dishonest.
 4       Q   Ever heard of the term malingering?
 5       A   Yes.
 6       Q   Is either symptom magnification or
 7   malingering something that you consider important when
 8   assessing a patient?
 9       A   Yes.
10       Q   Would it be even more important when there's
11   a brain injury involved?
12       A   No, it's just more important all the time
13   because this is a litigation process.  Realize that
14   this is not coming to me through the hospital.  This is
15   not a trauma call.  When I'm on call for trauma,
16   yesterday I got six -- five consults, I can't make a
17   decision whether I'm taking it or not.  I have to go.
18   This is voluntary work.  In other words, I can choose
19   to take this case or not take the case.
20           I would say I probably back out or don't take
21   at least one to ten cases a year because I don't
22   believe in the case or I think the person is a liar or
23   I think it's a misdiagnosis.  I have to get a -- one
24   plus one has to equal two for me to take the case.
25           So in every case that I do, I put my formula
```

Page 31

```
 1   one plus one equals two.  If one plus one does not
 2   equal two, I don't take the case.  I don't need this
 3   work.  I'm very busy in this practice.
 4       Q   All right.  According to your report, Ms.
 5   Fylling was born March 24, 1947; is that right?
 6       A   I think so.
 7       Q   She was 69 years old at the time of the
 8   cruise in March of 2017?
 9       A   Yes.
10       Q   The date of the injury was March 4, 2017.
11       A   That's correct.
12       Q   All right.  So when you saw her, she was
13   what, 71 years old?
14       A   Yes.
15       Q   And the history of present illness section
16   that you have there, is that based on her own
17   self-reporting to you?
18       A   No, no.  It's based on her self-reporting,
19   but also I have to review the records to have accuracy
20   and premium.  Sometimes patients, especially when
21   they've had a brain injury and they're a chronic pain
22   patient, they may not be accurate so I have to dig it
23   out of the records as well as speak to the patient.
24   Now, what does definitely come from the patient is when
25   she says the patient states this and the patient states
```

Page 32

```
 1   that.  That comes directly from the patient.
 2       Q   Okay.  For example, if she stated to you that
 3   she was involved in a trip and fall?
 4       A   Yes.
 5       Q   Did she tell you what specifically she
 6   tripped on?
 7       A   I don't think so.  I'm not an accident
 8   reconstructionist.  I'm not going to have any opinions
 9   regarding how it happened or why it happened.  Was
10   there milk on the floor, was there something wet on the
11   floor.  That's outside my area of expertise as a
12   physiatrist.  All I can say is it's a slip and fall,
13   trip and fall, she fell striking the left side of her
14   face and her forehead with full force onto the granite
15   floor.  Now, is that true or not, that's what she told
16   me.  Maybe there's a videotape to confirm it.
17       Q   And where it says here, for example, on the
18   first page the patient stated, are those comments being
19   made to you or to your staff?
20       A   No, it's being stated to my PA, and then when
21   the HPI is done, I come into the room and the PA has to
22   present that to me in front of the patient, and we give
23   the patient the opportunity to correct it.  That way we
24   have two bites at the apple.
25       Q   So any time it says the patient stated,
```

Page 33

1   that's information that's coming directly from
2   Ms. Fylling?
3       A   The patient, yes.
4       Q   So she was able to give you a history when
5   you saw her on October 3, 2018?
6       A   Yes.
7       Q   She was able to tell you what happened to
8   her?
9       A   Yes.
10      Q   All right.  Did she tell you what footwear
11  she was wearing on March 4th, 2017?
12      A   No, I didn't ask her that.
13      Q   Did she tell you whether or not she felt sick
14  on the date of her accident?
15      A   I didn't ask her that.
16      Q   Okay.
17      A   It's what's documented in my records, my
18  understanding of the case.  Now, if there's something
19  that I don't know or she lied to me or you have proof
20  that she lied to me, I'll resign from the case right
21  now.
22      Q   Do you remember if the history was coming
23  from her only or, for example, was her husband there
24  filling in any blanks?
25      A   You know what, I can't remember if her

Page 34

1   husband was there or not.  I don't want to give
2   misleading testimony.  I can't remember.
3       Q   Okay.  When you were asking her about her
4   incident, did she tell you how long after her fall she
5   went to the ship's medical center?
6       A   I didn't ask her that question.  The patient
7   stated she was evaluated at the ship's infirmary.  The
8   practitioner palpated her face.  I don't know if it was
9   an hour.  I don't know if it was two days.  I don't
10  know.
11      Q   Do you know how long the cruise was in March
12  of 2017?
13      A   I don't know.
14      Q   Did she disembark after her accident?
15      A   No, no.  I think she tried to complete the
16  cruise because she needed continuing education credits,
17  and I think she finished it.
18      Q   So continuing medical education credits,
19  right?
20      A   Yeah.  Stayed on the ship to obtain the CME
21  certification.  I think that she had a hard time --
22  according to the records, she had a hard time sitting
23  through the course and walking and doing that stuff.
24  She didn't participate in any shore excursions.  She
25  only attended the events that were required for her

Page 35

1   certification.  Then she went back to her room.  She
2   stated she was able to attend two shows, and she also
3   went to dinner every night on the cruise ship.  She
4   really did not want to lose her certification.  Her
5   husband had to walk her from the room to the class
6   where she sat the entire time.  So she continued to
7   participate.
8       Q   Okay.  So the certification that she was so
9   concerned with, that's for legal nurse consultant;
10  that's for that job?
11      A   Yes.
12      Q   And as you understand it, did she have to
13  attend courses or classes throughout the cruise in
14  order to keep that certification?
15      A   Yes.
16      Q   She attended those?
17      A   Yes.
18      Q   Do you know if she actually submitted CME
19  credits?
20      A   I don't know.
21      Q   Okay.  Do you have an understanding as to
22  what day of the cruise this accident happened on?
23      A   I don't know.
24      Q   All right.  Do you know where the ship was
25  leaving from?

Page 36

1       A   I don't know.
2       Q   Okay.  Well, the cruise ship goes to several
3   ports of call, correct?
4       A   Correct.
5       Q   So if Ms. Fylling had a problem, she could
6   have gotten off at any of the ports of call and sought
7   medical treatment there?
8           MR. ERIKSEN:  Object to form.
9           THE WITNESS:  I don't know how to answer
10      your question.  I don't know what she can do,
11      and I -- I mean, maybe she's smart.  She
12      doesn't want to get off in a third world
13      country and be treated for a concussion.  So
14      can she physically do it, probably.
15  BY MR. PEREZ:
16      Q   Okay.
17      A   But she has a medical education, and she
18  knows that might not be in her best interest.  But what
19  I do know is, she didn't do it.  So I don't want to
20  give meaningless, speculative answers under oath.  All
21  I can tell you is, from my understanding she did not
22  get off the ship in third world countries and get
23  treated.
24      Q   Let me rephrase the question.  Do you know,
25  in light of Mr. Eriksen's objection, do you know

Page 37

1    whether or not she sought medical treatment at any port
2    of call?
3        A  I don't know.
4        Q  And you referred to some of these port of
5    calls as possibly being third world countries.  What
6    about Fort Lauderdale?
7        A  Well, that would be a matter of
8    interpretation.
9        Q  According to your report it says the patient
10   states she sustained a concussion.  Is that based on
11   her own self-reporting to you?
12       A  Well, you know, that's what she says but it's
13   been confirmed by her treating neurosurgeon and by
14   other people.  Remember, I did call the treating
15   doctors so I'm not operating in a vacuum here.
16       Q  Okay.  When she came to see you on October 3,
17   2018, did she have notes with her about her symptoms?
18       A  I don't remember that.  I mean, she may have,
19   but I don't know.
20       Q  Did she have notes with her giving a history
21   of prior surgeries?
22       A  I don't want to give misleading testimony.  I
23   can't remember.  I don't know.  I'm not avoiding your
24   questions.  I just don't want to speculate under oath.
25       Q  That's fine.  That's fine.  Here's what I'm

Page 38

1    trying to get at.  In terms of the history that she
2    gave you for either symptoms that she was suffering
3    from or prior surgeries or prior medical treatment, did
4    that all come from memory or did she have any paperwork
5    with her?
6        A  I don't know.  But here's what I do know.  I
7    think she's very smart.
8        Q  Okay.
9        A  This lady is educated and she is very bright.
10   This is not your run of the mill floor nurse.  This is
11   somebody who is very smart.
12       Q  Okay.  All right.  Other than the classes
13   that she needed to attend to keep her certification,
14   did she also tell you that she attended two shows?
15       A  Yes.
16       Q  And she also went to dinner on the ship?
17       A  Every night.
18       Q  So this isn't a situation where she was stuck
19   in her room in bed the entire time, right?
20       A  No, no.  This is not a severe traumatic brain
21   injury.  This is not a penetrating wound to the head.
22   This is a concussion, a mild concussion, and when we
23   get into that, realize that a concussion is a mild
24   traumatic brain injury, and the truth is 85 percent of
25   those patients get better within three months.  That's

Page 39

1    the end of it.  15 percent of those patients don't get
2    better and they're known as the miserable minority.
3    That's not something I made up.  That's in the
4    literature.  That's peer-reviewed literature that I put
5    in here.
6        Q  Okay.
7        A  And some of these patients that have this
8    condition are miserable, and they lose cognition, they
9    lose ability to have a quality of life, they lose the
10   ability to enjoy life.  And there's no way to predict
11   who is going to be in the miserable minority, but it
12   does happen, and I have seen it in this practice.
13       Q  Concussion symptoms, would you agree with me
14   that they are subjective?
15       A  The way you've asked the question, all
16   symptoms are subjective that comes from the patient.
17       Q  Okay.  But if I come in and I tell you, hey,
18   I hit my head and now I have headaches, is there some
19   sort of test that you can conduct to determine whether
20   or not I have a headache?
21       A  No, but if you came in and told me you had
22   pain in your right shoulder, I can get an x-ray of your
23   right shoulder.  And if your humerus is in pieces, that
24   would be the objective medical evidence for the
25   foundation that you have pain because your humerus is

Page 40

1    in pieces.
2        This case is very unique and actually for me
3    from an academic standpoint is very interesting because
4    you know as we go fast forward, you know, she had a
5    problem, she had a surgical procedure.  They punctured
6    one of the arteries.  She had a bleed in her head.  She
7    was in the ICU.  But the interesting thing is, her
8    symptomatology prior to that which has nothing to do
9    with this accident was clearly documented prior to the
10   AV malformation.
11       So the symptomatology as it relates to the
12   miserable minority secondary to this fall has been
13   consistent before the AV malformation, before the
14   puncture of the artery, after the curing of the artery.
15       So in answering your specific question,
16   medicine is practiced 90 percent by history and if you
17   look at the history and you speak to the treating
18   neurosurgeon and Dr. Hoh, which was the surgeon that
19   cured the AV malformation, her symptomatology is
20   consistent.
21       So do I have an objective medical evidence,
22   do I have a measurement of a blood test or an MRI to
23   show that she has symptoms of a mild concussion that
24   has put her in the miserable minority, no, I don't.
25   But what I do have is an ongoing history.  She treated

Page 41

1    with a neurosurgeon before, prior to subject incident
2    for a back problem. Never had a problem of what she's
3    complaining about after subject incident.
4         So we have a documented situation with a
5    neurosurgeon, she didn't have these problems. She has
6    subject accident. She has these problems. Now she has
7    this medical condition that has nothing to do with
8    subject accident, and she still has the same
9    symptomatology after that.
10        So the causation -- and the questions you're
11   asking me are about causation. There are three prongs
12   of causation that's been peer-reviewed, published and
13   documented. It was documented in the American Academy
14   of Physical Medicine and Rehabilitation Journal of
15   2009. It came from the University of Oregon Healthcare
16   Sciences. And the three prongs are biological
17   plausibility, temporality and ruling out other
18   extraneous causes. And the bottom line is, she meets
19   all three of those because it's consistent in the
20   record.
21        It's consistent with the neurosurgeon prior
22   to this incident. It's consistent with the
23   neurosurgeon after this incident. It's consistent with
24   the same set of complaints after the AV malformation
25   and the puncture of the artery and the ICU and all of

Page 42

1    that.
2         So to answer your question, no, I don't have
3    a blood work or a lab test to confirm her subjective
4    complaints of pain, but what I do have is the timeline
5    of her seeing the neurosurgeon prior to subject
6    accident, her seeing the neurosurgeon after subject
7    accident, and her seeing other doctors after the AV
8    malformation and the puncture of the vessel. That's
9    why this case is unique, because she truly fits in
10   what's known in the literature, peer-reviewed,
11   published literature as the miserable minority.
12        THE REPORTER: You're saying AB
13   malformation or AV?
14        THE WITNESS: AV. That's this whole case
15   in a nutshell. So now the deposition should
16   be over.
17   BY MR. PEREZ:
18        Q   All right. Doctor, so some of the symptoms
19   that she's experiencing, can you go ahead and tell us
20   what she told you currently or at least as of October
21   3, 2018?
22        A   All right.
23        MR. ERIKSEN: Are you talking symptoms as
24   of that date?
25        MR. PEREZ: Well, that she complained to

Page 43

1    him.
2         MR. ERIKSEN: That she was having that
3    day?
4         THE WITNESS: At the time that I saw the
5    patient --
6         MR. PEREZ: Hold on.
7         MR. ERIKSEN: Object to form.
8         MR. PEREZ: Symptoms that she reported to
9    Dr. Lichtblau on October 3, 2018, not just for
10   that day but anything that she told him she
11   was experiencing.
12        THE WITNESS: The number one thing, and
13   you see this in all mild traumatic brain
14   injuries, concussions, headache. The patient
15   states she continues to have severe headaches.
16   She states her headaches can be very
17   debilitating and go as high as a ten out of
18   ten on the one to ten scale for pain. She's
19   saying she has to lie down with ice when her
20   headaches occur.
21        She states she has continued issues with
22   her balance, especially when she is having her
23   headaches. She states she continues to have
24   blurry vision in her right eye. She states
25   she continues to have difficulty with

Page 44

1    short-term memory and concentration and feels
2    like she is in a constant fog. That is
3    classic, classic mild traumatic brain injury
4    or concussion, whatever you want to call it.
5    That's what she told me on the day that I saw
6    her.
7         Now, what's interesting is, going back to
8    your last question, I don't have an x-ray, an
9    MRI, a CT scan or blood test to confirm that,
10   but what I do have is the fact that she saw a
11   neurosurgeon for a back or spine issue prior
12   to subject incident. Never had these
13   complaints. She comes back after subject
14   incident, has these complaints. He sends her
15   to get an AV malformation corrected. It was
16   punctured. Then she went to the University of
17   Florida. Eventually, it was corrected. But
18   her complaints remained the same. And this is
19   classic miserable minority, classic post
20   concussion.
21   BY MR. PEREZ:
22        Q   Okay. You've seen records from 2010 from
23   Dr. Mark Montgomery when you reviewed the records?
24        A   Mark Montgomery? Let's see. I don't know
25   that I have Mark Montgomery. That name doesn't ring a

Page 45

1  bell.
2      MR. ERIKSEN:  You do.  They're in the
3  pile.
4      THE WITNESS:  I do?  Let me see here.
5  Maybe I do have it.  Yes.  What about it?
6  BY MR. PEREZ
7      Q   Okay.  Well, did you come across records from
8  Dr. Mark Montgomery from 2010 where she was
9  complaining, she being Ms. Fylling, of lightheadedness
10  and vertigo?
11      A   Yes.
12      Q   Those are symptoms that she's currently
13  experiencing, right?
14      A   Correct.
15      Q   And she experiencing those as far back as
16  2010?
17      A   I agree.
18      Q   She also complained as far back as 2010 to
19  Dr. Mark Montgomery of blurred vision?
20      A   I agree.
21      Q   Would you agree that she also complained to
22  Dr. Mark Montgomery of lack of concentration?
23      A   I agree.
24      Q   And have you seen records where she told her
25  treating physicians that she had experienced those

Page 46

1  symptoms as far back as 2009?
2      A   That's correct.  But the frequency, duration,
3  and intensity of those symptoms are not the same after
4  subject accident.  So I mean, we can argue this all
5  night long.  If you want to say did she have some of
6  those same symptoms, yeah, maybe she did because she
7  had vertigo or whatever, but after subject accident,
8  the frequency, duration, and intensity of those
9  symptoms, especially the headaches, became prominent in
10  front of the line, and they never went to the back
11  of the line regardless of whether she had the AV
12  malformation and the puncture of the vessel and all
13  that.  It's been the same.
14      Now, that's not my confirmation.  That's me
15  speaking to her treating neurosurgeon.  He confirmed
16  it.  So we have a treating neurosurgeon confirming it.
17  We have a primary care physician confirming it, and
18  medicine, like I say, it's practiced 90 percent by
19  history, 5 percent by confirmatory tests and 5 percent
20  by either physical examination or patient observation.
21      Well, we can't -- there's nothing to
22  really -- you can't do this by headaches and this type
23  of stuff.  You can't do this by a blood test or MRI or
24  CT.  You can't accurately define headaches with
25  physical examination.  But what you can do is practice

Page 47

1  medicine using the 90 percent of the past medical
2  history and her current treating doctors.  If you look
3  at the facts and you add them up, one plus one does
4  equal two.
5      However, if you can show me one plus one
6  equals the square root of seven, I'll back out of the
7  case.  At least this is the way I understand the case.
8  If you have records that would make me believe
9  differently, I will back out of the case.  But it's
10  hard for me to do that because I did speak to Dr. Brian
11  Hudson, and Brian Hudson actually signed off on what he
12  told me.  I did speak to Brian Hoh, who is also a
13  treating neurosurgeon who actually fixed the AV
14  malformation, and I did speak to A-N-T-I-O-N-E Dakouny,
15  D-A-K-O-U-N-Y, her internist, primary care physician.
16      Those three doctors carry a lot of weight for
17  me because they confirmed my understanding of the case
18  before subject accident and after subject accident
19  which is critically important for my causation opinion.
20      Q   Okay.  Back in 2010, do you know if
21  Dr. Montgomery recommended that she complete vestibular
22  therapy?
23      A   Yes, he did.
24      Q   What is vestibular therapy?
25      A   To help her balance.

Page 48

1      Q   Do you know if she completed that in 2010?
2      A   I don't know.
3      Q   All right.  Did she return to -- did she
4  return in 2013 back to her treating doctors because she
5  was complaining again of vertigo?
6      A   Yes.
7      Q   Did she complain that she had feelings of
8  vertigo for up to six weeks at a time?
9      A   Yes.
10      Q   Hours every day?
11      A   Yes.
12      Q   For six weeks straight?
13      A   Yes.  And that's exactly what she had,
14  vertigo.  If you treat vertigo, which I do, and you
15  have to diagnose it, you know that vertigo can be very
16  debilitating.  But vertigo is not consistent with a
17  mild traumatic brain injury or post-concussion
18  syndrome.  It's a different set of circumstances.
19  People that suffer from vertigo, they suffer from
20  dizziness, especially with a change in positions.  And
21  that's what she had back then, was vertigo.  She was
22  not suffering from a mild traumatic brain injury or a
23  concussion back then.  She was being treated by an ENT
24  doctor for vertigo.
25      Q   This primary care physician that you've been

12 (Pages 45 to 48)

Page 49

1  talking about, at least the primary care physician that
2  she saw once she got off the cruise, is that
3  Dr. Dakouny?
4      A  I don't know.  The way you've asked the
5  question, I don't know.  My understanding is
6  Dr. Dakouny had taken care of this patient for an
7  extended period of time.
8      Q  Have you seen records from Dr. Dakouny?
9      A  I believe that I have.
10     Q  Have you seen records where Dr. Dakouny notes
11  that Ms. Fylling had an episode while on vacation in
12  Mexico where she complained of palpitations?
13         MR. ERIKSEN:  Object to form.
14         THE WITNESS:  Yes, but that's got nothing
15  to do with this.
16  BY MR. PEREZ
17     Q  Okay.
18     A  Palpitations has nothing to do with my
19  opinions.
20     Q  Does Ms. Fylling have an irregular heart
21  beat?
22     A  Well, yes, she's got what's known as
23  tachy-brady syndrome with --
24         THE REPORTER:  I'm sorry, with what?
25         THE WITNESS:  Tachy-brady,

Page 50

1  T-A-C-H-Y-B-R-A-D-Y.  It means tachycardia,
2  bradycardia syndrome, with chronotropic
3  incompetence.
4  BY MR. PEREZ
5      Q  Okay.
6      A  The answer is yes.
7      Q  Can that cause dizziness?
8      A  Oh, sure, it can.
9      Q  Can that cause breathlessness?
10     A  Yes.
11     Q  Have you seen records from Dr. Dakouny where
12  he indicates that Ms. Fylling has a high BMI?
13         MR. ERIKSEN:  Object to form.
14         THE WITNESS:  Yes.
15  BY MR. PEREZ
16     Q  She's obese?
17     A  Yes.
18     Q  Have you seen records from a Dr. M-O-N-G-E,
19  Monge -- I have no idea how to pronounce that.  Have
20  you seen records from that doctor?
21     A  I think so.
22     Q  Have you seen records that Ms. Fylling
23  suffers from obstructive sleep apnea?
24     A  Yes.  That's on No. 6 on my past medical
25  history.

Page 51

1      Q  Can sleep apnea cause dizziness?
2      A  Yes.
3      Q  Can it cause breathlessness?
4      A  Yes.
5      Q  Can it cause headaches?
6      A  Yes.
7      Q  Can it cause lack of -- rather, let me
8  rephrase that.
9         Can sleep apnea cause lack of concentration?
10     A  Yes.
11     Q  Can it cause sleeplessness?
12     A  Yes.
13     Q  All right.  Can that cause cognitive
14  deficiency?
15     A  Yes.
16     Q  What is sick sinus syndrome?
17     A  That's where your sinal atrial node is not
18  firing.  That's really part of the tachy-brady
19  syndrome.
20     Q  And can that cause dizziness?
21     A  Yes.
22     Q  Can it also cause lightheadedness?
23     A  Yes, because it's an itis for cardiac
24  arrhythmia.
25     Q  Does Ms. Fylling also have hypothyroidism?

Page 52

1      A  Yes.
2      Q  And reflux disease?
3      A  Yes.
4      Q  Have you seen records from Dr. -- I'm going
5  to call him Monge, M-O-N-G-E, where he advised Ms.
6  Fylling not to travel due to her sleep apnea issues?
7         MR. ERIKSEN:  Object to form.  What year
8  are we talking about?
9         MR. PEREZ:  2012.
10        THE WITNESS:  I think that's true.
11  BY MR. PEREZ
12     Q  Have you seen any sleep study results for
13  Ms. Fylling?
14     A  No.
15     Q  Have you seen records from Dr. Dakouny in
16  2012 where Ms. Fylling was saying she could barely walk
17  without pain?
18     A  I believe that's true.
19     Q  What is Celebrex?
20     A  A nonsteroidal anti-inflammatory.
21     Q  Is that normally prescribed to patients who
22  are suffering from arthritic pain?
23     A  Yes.
24     Q  Do you know how long it's been since
25  Ms. Fylling had been prescribed Celebrex?

13  (Pages 49 to 52)

Page 53

1    A   No.
2    Q   Okay.  Do you know if Dr. Dakouny prescribed
3    Celebrex back in 2013 because she was suffering from
4    pain?
5    A   He did.
6    Q   Has Ms. Fylling been diagnosed with
7    osteoarthritis?
8    A   She has.
9    Q   Have you seen records from a Dr. Jeffrey
10   Brown?
11   A   Yes.
12   Q   Did you see that Dr. Jeffrey Brown diagnosed
13   Ms. Fylling with an inner ear nerve issue?
14       MR. ERIKSEN:  What year?
15       MR. PEREZ:  2013.
16       THE WITNESS:  Yes.
17   BY MR. PEREZ
18   Q   Okay.  What is Ramsay Hunt syndrome?
19   A   Off the top of my head, I can't remember, but
20   I believe it has something to do with balance.
21   Q   Has Ms. Fylling been diagnosed or was she
22   diagnosed in 2013 with a vestibular neuritis?
23   A   Yes.
24   Q   What's what?
25   A   That's what Ramsay Hunt is.

Page 54

1    Q   Can you explain what that is?
2    A   It's a reason for a person to have a problem
3    with balance because of an inner ear problem.
4    Q   Okay.  So Ms. Fylling prior to March 4, 2017
5    had an inner ear problem?
6    A   I agree.
7    Q   And that inner ear problem caused her
8    periodically to have vertigo?
9    A   I agree.
10   Q   All right.  Have you seen records where
11   Ms. Fylling complained that she experienced vertigo
12   episodes while driving?
13       MR. ERIKSEN:  What year?
14       MR. PEREZ:  2013.
15       THE WITNESS:  That's correct.
16   BY MR. PEREZ
17   Q   Did you see that Ms. Fylling told Dr. Dakouny
18   that she fell down in her kitchen due to an episode of
19   vertigo?
20       MR. ERIKSEN:  What year?
21       MR. PEREZ:  2013.
22       THE WITNESS:  That's correct.
23   BY MR. PEREZ
24   Q   What is Prednisone?
25   A   It's a very powerful anti-inflammatory.

Page 55

1    Q   Can Prednisone cause vision problems?
2    A   Yes.
3    Q   Can it cause confusion?
4    A   Yes.
5    Q   Can it also cause depression?
6    A   Yes.
7    Q   Have you seen that Ms. Fylling was diagnosed
8    with herpes?
9    A   That is correct.
10       MR. ERIKSEN:  When?
11       MR. PEREZ:  2013.
12       THE WITNESS:  As a matter of fact, that
13   has nothing to do with this case.
14   BY MR. PEREZ
15   Q   What is Meclizine?
16   A   That is what we use for antinausea.
17   Q   What is Diazepam?
18   A   That is a -- technically a Valium.  It's
19   benzodiazepine also used for antispasmodic.
20   Q   On page 5 of your report you have some
21   medications that Ms. Fylling has been prescribed and
22   was taking?
23   A   Yes.
24   Q   Was that based on her reporting to you from
25   memory, or does she have some sort of piece of paper

Page 56

1    that told you all of that?
2    A   You know, I can't remember.  I don't want to
3    give misleading testimony.  I can't remember if she had
4    it written down or she told us, but this is so accurate
5    I would venture to say that it was probably written
6    down.
7    Q   What is Bumex?
8    A   That is a loop diuretic.
9    Q   Is that commonly prescribed for high blood
10   pressure?
11   A   Yes.
12   Q   And is one of the side effects of Bumex
13   dizziness, can cause dizziness?
14   A   Yes.
15   Q   Can it cause dehydration?
16   A   Yes.
17   Q   Can dehydration cause headaches?
18   A   Yes.
19   Q   What is Levothyroxine?
20   A   It's a thyroid medicine.
21   Q   And that's for someone that has -- their
22   thyroid gland is not producing enough thyroid hormone?
23   A   Right.
24   Q   And thyroid hormone, would you agree, is
25   important for maintaining normal mental function?

Page 57

1    A   Yes.
2    Q   Okay.  Zyrtec is an allergy medication?
3    A   Yes.
4    Q   Can Zyrtec cause dizziness?
5    A   Yes.
6    Q   Can Zyrtec cause drowsiness?
7    A   Yes.
8    Q   What is omeprazole?
9    A   I'm not sure.  I don't write for it.
10        Q   Do you know if one of the common side effects
11   of omeprazole is headaches and dizziness?
12        A   Probably.  You can have headaches and
13   dizziness from every one of these medications.
14   Q   What is metoprolol?
15   A   Beta-blocker.
16   Q   Is that for high blood pressure?
17   A   Yes.
18   Q   Can that cause dizziness?
19   A   Yes.
20   Q   Celebrex, we've already talked about, as a
21   pain medication, anti-inflammatory drug?
22   A   Yes.
23   Q   Can Celebrex cause dizziness?
24   A   Yes.
25   Q   What about nausea?

Page 58

1    A   Yes.
2    Q   Can it cause heartburn?
3    A   Yes.
4    Q   What is Valtrex?
5    A   Valtrex is an antiviral for herpes.
6    Q   And can Valtrex cause headaches?
7    A   Yes.
8    Q   Can Valtrex cause dizziness?
9    A   Yes.
10   Q   Can it cause depression?
11   A   Yes.
12   Q   What's Namenda?
13   A   That is for concentration.
14   Q   And can Namenda cause confusion?
15   A   Yes.
16   Q   Can it cause dizziness?
17   A   Yes.
18   Q   What about headaches?
19   A   Yes.
20   Q   Can it cause depression?
21   A   Yes.
22   Q   And magnesium citrate, is that a laxative?
23   A   Yes.
24   Q   Can magnesium citrate cause dehydration?
25   A   Yes.

Page 59

1    Q   Can magnesium citrate cause dizziness?
2    A   Yes.
3    Q   Can it also cause headaches?
4    A   Yes.
5    Q   Gabapentin, that's a pain medication?
6    A   Yeah.  Well, it's actually an antiseizure
7    medication that we use for neuropathic pain.
8    Q   Can Gabapentin cause trouble speaking?
9    A   Yes.
10   Q   Advair is another medication Ms. Fylling was
11   taking, right?
12   A   Yes.  That's a -- for asthma.
13   Q   And can Advair reduce adrenal function which
14   leads to lack of energy?
15   A   Yes.
16   Q   Can Advair also lead to vision problems?
17   A   Yes.
18   Q   Can Advair cause headaches?
19   A   Yes.
20   Q   All right.  What is Docusate Sodium?
21   A   Laxative.
22   Q   Can Docusate Sodium cause dizziness?
23   A   It could, especially if you have diarrhea.
24   Q   Oxycodone, is that a controlled substance?
25   A   Yes, narcotic.

Page 60

1    Q   That has to be prescribed by you?
2    A   It has to be prescribed by a physician, yes.
3    Q   And oxycodone can cause dizziness?
4    A   Yes.
5    Q   And it can also cause lightheadedness?
6    A   Yes.
7    Q   Meclizine?
8    A   That's like anti -- that's for, what do you
9    call it, sea sickness.
10   Q   It's for vertigo?
11   A   Vertigo.
12   Q   Can that cause loss of balance?
13   A   Yes.
14   Q   All right.  And what is ondansetron?
15   A   I don't know.  I've never used it.
16   Q   All right.  Would you agree that Ms. Fylling
17   was taking all of these medications prior to March 4,
18   2017?
19   A   Yes.
20   Q   Have you seen any notes from Ms. Fylling
21   where she was documenting her vertigo episodes back in
22   2013?
23   A   I don't know.  I don't want to give
24   misleading testimony.  I don't remember it.
25   Q   Have you seen records from a Dr. Nicholas

15 (Pages 57 to 60)

Page 61

```
 1   Connors in 2013?
 2       A   I think so.  2013?  Yes, Nicholas Connors,
 3   Advanced Orthopedic Center.
 4       Q   Okay.  And have you seen records from
 5   Dr. Nicholas Connors in October of 2013 where
 6   Ms. Fylling was complaining of vertigo?
 7       A   Yes.
 8       Q   Going back to Dr. Montgomery, did you see
 9   that Ms. Fylling returned in October of 2013 to
10   Dr. Montgomery with more complaints of episodes of
11   prolonged vertigo?
12       A   Yes.
13       Q   Did you see Dr. Montgomery's notes from
14   November of 2013 where Ms. Fylling was hit in the face
15   with a frozen cube that fell out of the freezer?
16       A   Yes.
17       Q   Did you see that Dr. Montgomery diagnosed her
18   with labyrinthitis?
19       A   Yes.
20       Q   What is labyrinthitis?
21       A   Inflammation in the labyrinth, the inner ear,
22   which can cause dizziness.
23       Q   Okay.  Do you see as far back as January of
24   2014 Dr. Dakouny was prescribing Ms. Fylling Xanax?
25       A   That's correct.
```

Page 62

```
 1       Q   What about Valium?
 2       A   Yes.
 3       Q   Can medications cause cognitive deficiencies?
 4       A   Yes.
 5       Q   Can medications cause cognitive decline?
 6       A   Yes.
 7       Q   Have you seen records from a Dr. Cossu,
 8   C-O-S-S-U, indicating that Ms. Fylling was complaining
 9   of vertigo in January of 2014?
10       A   I believe that's correct.
11       Q   Okay.  Do you see records from Dr. Dakouny in
12   April of 2014 where Ms. Fylling was still complaining
13   of episodes of lightheadedness and vertigo?
14       A   Yes, that's correct.
15       Q   Do you see records from any doctors prior to
16   March of 2017 that found the etiology of the vertigo,
17   what was causing it?
18       A   I don't remember that.
19       Q   Okay.  Do you agree that back in May of 2015,
20   Ms. Fylling had some sort of a detachment in her eye?
21       A   Yes.
22       MR. ERIKSEN:  I'm going to object to the
23   form of that.  It's a little vague.
24       MR. PEREZ:  All right.
25
```

Page 63

```
 1   BY MR. PEREZ
 2       Q   Did you see a record from Dr. Niffenegger
 3   from May of 2015 indicating that Ms. Fylling had an
 4   acute posterior vitreous detachment?
 5       A   She did.  I agree.
 6       Q   Do you know what that is?
 7       A   I'm not an eye guy, but that's an eye
 8   problem.
 9       THE REPORTER:  Can you spell Niffenegger?
10       THE WITNESS:  N-I-F-F-E-N-E-G-G-E-R.
11   BY MR. PEREZ
12       Q   Did you see records from that doctor
13   indicating that Ms. Fylling was complaining that she
14   also had floaters in her eye?
15       A   That's correct.
16       Q   And she also was complaining that those
17   floaters were causing her to be dizzy?
18       A   I agree.
19       Q   All right.  That's all prior to March of
20   2017?
21       A   I agree.
22       Q   Prior to March 4, 2017, did you see a record
23   that Ms. Fylling went back to Dr. Niffenegger in
24   February of 2017 and canceled a vacation because she
25   was concerned of another tear?
```

Page 64

```
 1       A   That is correct.
 2       Q   All right.  Now, going back to when
 3   Ms. Fylling -- let me ask you this:  Have you seen
 4   shipboard records from the cruise ship?
 5       A   I think so.
 6       Q   Okay.  Did you see or do you have any
 7   indication whether or not Ms. Fylling lost
 8   consciousness while she was on the ship?
 9       A   I don't think she did.
10       Q   Okay.  What's a GCS scale?  What is that?
11       A   Glasgow Coma Scale.  Hers was 15.  It was
12   normal.
13       Q   So immediately after the accident when she
14   goes down to the ship's medical center, her GCS scale
15   was normal?
16       A   Right.  She had a Glasgow Coma Scale of 15,
17   which is normal.  She never lost consciousness.  Of
18   course, a loss of consciousness and Glasgow Coma Scale
19   of 15 doesn't mean you can't have a concussion, have a
20   mild traumatic brain injury and be part of the
21   miserable minority, and there is documented literature
22   that I have which is inconsistent with your defense IME
23   neurosurgeon's opinion that with the normal Glasgow
24   Coma Scale and no loss of consciousness, she couldn't
25   have a mild traumatic brain injury and couldn't have a
```

16 (Pages 61 to 64)

Page 65

1    concussion. That's just not true. That's me trying to
2    tell you under oath one plus one equals two. A
3    concussion is a clinical diagnosis. It's not -- you
4    don't have to have a loss of consciousness and you
5    don't have to have an abnormal Glasgow Coma Scale to
6    suffer from a concussion.
7        Q   Okay. Now in your report, you make reference
8    to a CT scan that was taken March 13, 2017?
9        A   Yes. Head CT. That's going to be normal.
10       Q   So you agree that the CT scan done March 13,
11   2017 didn't show any acute pathology, right?
12       A   No, I agree. And realize with a mild
13   traumatic brain injury and a concussion, you don't have
14   to have any pathology.
15       Q   All right.
16       A   And, in fact, I would say 99.9 percent of
17   them never have any pathology in a mild traumatic brain
18   injury or a concussion.
19       Q   Have you seen any indication that there was
20   some sort of a contusion to her head?
21       A   No.
22       Q   All right. Or any brain bleed in her head?
23       A   No. And, again, mild traumatic brain injury,
24   you usually don't have a brain bleed.
25       Q   You saw an April 3, 2017 MRI which

Page 66

1    demonstrated mild chronic small vessel white matter
2    disease?
3        A   Yes.
4        Q   And --
5        A   That has nothing to do with this.
6        Q   Why does it have nothing to do with this?
7        A   Because that has to do with the aging
8    process.
9        Q   Okay. So white matter changes in the brain
10   can be attributed to age?
11       A   Right. White matter changes in her brain I
12   don't think have anything to do with a mild traumatic
13   brain injury.
14       Q   Okay. What about meningioma?
15       A   No. That has nothing to do with trauma.
16   That preexisted subject incident.
17       Q   But she was diagnosed that she had a
18   meningioma in her head?
19       A   Correct, but that's a benign situation.
20       Q   Can a meningioma cause changes in vision?
21       A   Yes.
22       Q   Can it cause headaches?
23       A   Yes.
24       Q   Can it cause hearing loss?
25       A   Yes.

Page 67

1        Q   Does Ms. Fylling suffer from high blood
2    pressure?
3        A   Well, it depends if she's well controlled or
4    not. If she's controlled, she shouldn't have it. Does
5    she have hypertension, yes, she does, but she's under
6    medications for it.
7        Q   Do you see records of a April 18, 2017 MRI
8    venogram?
9        A   Yes.
10       Q   Do you remember what those revealed?
11       A   No, but it had nothing to do with the injury
12   sustained in this accident.
13       Q   Okay.
14       A   She does not have inner cranial pathology as
15   a result of the accident that can be detected on CT,
16   MRI, x-ray, none of that. That's not what a mild
17   traumatic brain injury is.
18       Q   What about the CT angiography from April 20,
19   2017; did you see that report?
20       A   Yes, I did.
21       Q   What did that demonstrate?
22       A   I gotta look. What date is it?
23       Q   April 20th. It's on Page 2 of your report.
24   It's there.
25       A   5/20. Demonstrates markedly tortuosity of

Page 68

1    her left intracerebral artery or inner cranial -- inner
2    internal carotid artery and moderate right inner
3    internal carotid artery inferior to her skull base.
4        Q   What is tortuosity?
5        A   Twisted.
6        Q   Can that cause trouble speaking?
7        A   Yes, because it's the left internal carotid
8    artery which supplies the left side of the brain which
9    would be the parietal lobe, temporal lobe, frontal
10   lobe, which has to do with speech. So the answer is
11   yes.
12       Q   Can that also cause vision problems?
13       A   Well, it depends where it is, but the answer
14   is, yes, it could.
15       Q   What about dizziness?
16       A   It could.
17       Q   Can the tortuosity of the left internal
18   carotid artery and the moderate right internal carotid
19   artery, can that also cause slowing of blood flow to
20   the brain?
21       A   Well, it could the way you've asked the
22   question. Anything is possible. But you have
23   collateral circulation from the opposite side so it
24   shouldn't.
25       Q   Okay. On May 2, 2017, did they find I guess

17 (Pages 65 to 68)

Page 69

1    this AV fistula?
2      A   Yes.
3      Q   That you mentioned earlier?
4      A   Yes. 5/2/17.
5      Q   Can AV fistula, can that cause intracranial
6    hypertension?
7      A   Yes.
8      Q   Can an AV fistula cause headaches?
9      A   Yes.
10      Q   Can it also cause dizziness?
11      A   Yes.
12      Q   So just so I understand, your position then,
13    you think the AV fistula that Ms. Fylling has was
14    caused by this shipboard accident?
15      A   No, I never said that. I said the opposite.
16    I said that that has nothing to do with this accident.
17      Q   So the AV fistula you're saying has nothing
18    to do with the accident?
19      A   No. Uh-uh. I never said that. Was that a
20    defense attorney trick? No, I never said that.
21      Q   If we can narrow the issues, we can narrow
22    the issues.
23      MR. ERIKSEN: Let the record reflect that
24    we're all smiling here.
25      THE WITNESS: That was a trick because I

Page 70

1    said earlier that had nothing to do with this
2    accident.
3      MR. PEREZ: Making sure. Making sure.
4      MR. ERIKSEN: Just wanted to see if you
5    were paying attention.
6    BY MR. PEREZ
7      Q   The social history that you have on Page 6 of
8    your report, that information, was that derived from a
9    résumé or was that given to you by Ms. Fylling?
10      A   No, I think that was a CV that she gave us or
11    something. It's too perfect.
12      Q   So she brought a CV to your office?
13      A   I think so or we got a CV somewhere. I don't
14    know that she brought it, but this is too perfect. She
15    couldn't have given us that.
16      Q   Okay. On Page 7 it looks like you did a
17    physical exam, right?
18      A   Yes.
19      Q   Part of your physical exam is a psychiatric
20    component?
21      A   Yes.
22      Q   And you wrote down here that her short and
23    long-term memory were intact?
24      A   Correct. But that's a cursory exam.
25    Remembering three things, dog, car and ball. I always

Page 71

1    remember them because I have them memorized. Serial
2    7's and that kind of thing, it's cursory. This isn't a
3    neuro-psych evaluation.
4      Q   Right, but in terms of what you did with her
5    that day, you determined that her short and long-term
6    memory were intact?
7      A   I agree.
8      Q   Okay. There's also a neurological component
9    to the physical exam that you did?
10      A   Yes.
11      Q   And you found that Ms. Fylling's speech was
12    normal?
13      A   Correct.
14      Q   In terms of neuropsychological deficits,
15    you're deferring those to a neuropsychologist?
16      A   I agree.
17      Q   Okay. Babinski sign, what is that?
18      A   That's when you have disruption of the
19    corticospinal track. She doesn't have that.
20      Q   And Romberg's sign, what is that?
21      A   That's when you close a person's eyes and
22    take out the visual input to balance and then they
23    fall. She doesn't have that.
24      Q   For coordination, her finger to nose test was
25    normal?

Page 72

1      A   Yes, and heel to chin, which is basically
2    you're checking cerebellar function. Those were within
3    normal limits.
4      Q   Fair to say that all the records that you
5    reviewed, you would have included them here in your
6    report?
7      A   No, only the ones that were pertinent.
8    Remember, there's some things that are just not that
9    important.
10      Q   All right. So you documented here in your
11    report what -- the records you reviewed that you felt
12    were pertinent?
13      A   Right, for causation. This is a very
14    interesting case from a neurophysiologic standpoint,
15    and that is, one can say that these symptoms are from
16    the AV malformation and the punctured vessel.
17      Uh-huh.
18      A   However, if you really pull away the veneer
19    and you look at the timeline and look -- apply the
20    three prongs of causation which has been peer-reviewed,
21    published and accepted, she had these problems -- did
22    not have these problems, no sustained chronic terrible
23    headaches, no sustained problems prior to subject
24    incident because she saw a neurosurgeon. It was not
25    documented.

18 (Pages 69 to 72)

Page 73

1      After subject incident, it was documented.
2  They found the AV malformation.  They had a problem
3  with trying to repair it.  Then she eventually goes and
4  gets it repaired and her symptomatology stays the same.
5  So when you pull away the veneer and you take away the
6  unexpected, what you see is one plus one equals two.
7      This case is very simple.  This patient is
8  part of the miserable minority secondary to a
9  post-concussion syndrome which is permanent in nature,
10 secondary to a fall on the ship.  It has nothing to do
11 with preexisting vertigo.  It has nothing to do with
12 the AV malformation, the meningioma, the perforation of
13 the vessel.  That is all irrelevant.
14     Q   Okay.  Part of a doctor's methodology is you
15 have to do differential diagnoses; is that right?
16     A   Oh, I agree.
17     Q   How is it that you're so certain that what
18 she suffers from is post-concussive syndrome?
19     A   Because if you look at the timeline, Dr. -- I
20 called Dr. Brian Hudson to accurately determine whether
21 this is more consistent with the AV malformation, the
22 surgery, the puncture of the vessel, or is it second to
23 post-concussive syndrome.  He stated -- because he had
24 seen her in the past prior to this for a spine problem.
25 It wasn't documented there.  So it's timeline because

Page 74

1  I've already admitted under oath, this is not the kind
2  of problem where you can get an MRI or a CT or an x-ray
3  and see it.  It's not a broken humerus.
4      So talking to the treating neurosurgeons and
5  looking at the timeline, she fits the three prongs of
6  causation.  Same thing with speaking to her treating
7  physician, Dr. Dakouny.  It's my opinion if you look at
8  the facts of the case, one plus one, they do equal two.
9  The facts of the case are not one plus one equals
10 seven.  If the facts of the case are one plus one
11 equals seven, I resign from the case.
12     Q   Let me ask you this, Doctor:  How many times
13 have you been hired by Mr. Eriksen?
14     A   I don't know, but my Elkins list would be
15 accurate.  I get, I don't know, my guess under oath,
16 and I'm telling you to look because I'll concede to
17 whatever you say it is because it's accurate in the
18 Elkins list, it is what it is, I'm going to guess under
19 oath it's three or four times a year, but he usually
20 has, you know, severely involved people.
21     Q   Well, your Elkins list contains your trials
22 and deposition testimony?
23     A   Correct.
24     Q   It doesn't tell me how many times he's hired
25 you?

Page 75

1      A   No.  I can tell you every time he's hired me,
2  we've gone to deposition.  I might not have gone to
3  trial.  I only remember going to trial with Mr. Eriksen
4  one time that I can recall.  There might have been
5  more, but I only recall once.  Every case I've done
6  with him, I think I've probably done a deposition
7  because the cases that he gives me are usually very
8  big.
9      Q   Okay.  Do you remember the first time you
10 were hired by Mr. Eriksen?
11     A   I've been in practice almost 30 years.  I
12 don't remember.
13     Q   Well, that brings me to -- the first time you
14 started testifying as an expert, was that 1992?
15     A   Yes.  It was the Francis Call case.
16     THE REPORTER:  Francis Call?
17     THE WITNESS:  Francis Call.  And in fact,
18 I ended up on national TV, and be the first
19 one to admit under oath that I had no idea
20 what I was doing, but I did it, and we had an
21 excellent result, and that was a brain injury
22 case.  We put a titanium cap in her head, and
23 her brain began to float and she woke up.
24 Never been done in the history of the world,
25 and I did that with a 3D CT scan and had Tech

Page 76

1  Medic in California produce this titanium
2  skull cap from the 3D CT scan, and we did that
3  for cosmetic purposes.  And your brain floats
4  in CSF but when we put this cap in and her
5  brain began to float, she totally woke up.  We
6  were shocked.  And that ended up on National
7  Medical Review.  And that jump started my
8  brain injury medicine career, and that was
9  back in 1992, and that was my first real legal
10 case.
11 BY MR. PEREZ
12     Q   All right.  But you don't remember what year
13 was the first time you were hired by Mr. Eriksen?
14     A   I don't know, and I'm not trying to avoid it.
15 I mean, you can ask him.
16     THE WITNESS:  When was the first time
17 hired me?
18     MR. ERIKSEN:  I don't remember.  It's
19 been years ago.  Okay?  That's all I can tell
20 you.  I just don't --
21     MR. PEREZ:  All right.
22     THE WITNESS:  I would say at least 15
23 years ago.  Now, when he first hired me, I
24 mean, it hasn't been a consistent, you know,
25 five or ten cases a year.  I might have done

Page 77

1    one or two cases for him and then there was a
2    hiatus, one or two cases, then a hiatus.
3    Mr. Eriksen is not what I would call a
4    frequent flyer.  I don't get a lot of work
5    from him.  I wish I did because he has very
6    good cases.
7  BY MR. PEREZ
8       Q   I just want to clarify something.  You
9    initially said he hires you about three or four times
10   per year, and now I think you've said five or ten?
11      A   No, I don't think so.  I don't think I said
12   that.  Look, I don't want to give misleading testimony.
13   It's in the Elkins list.  You count it up.  And when
14   you ask me that question under oath, I'm going to say,
15   sir, whatever it is, it is.  I don't know what it is.
16   It's a guess.  But, you know, the cases that
17   Mr. Eriksen hires me on are usually catastrophic.
18      Q   Do you remember the Berry versus Carnival
19   case?
20      A   No.
21          THE REPORTER:  Berry versus who?
22   Carnival?
23          MR. ERIKSEN:  That's the one you
24   testified in Miami in trial.
25          THE WITNESS:  In front of Judge Ungaro?

Page 78

1          MR. ERIKSEN:  Yes, it was.
2          THE WITNESS:  Okay.  That's Judge
3    Ungaro's case.  I do remember it because it
4    was a bench trial.  It wasn't a jury trial.
5    And she had her dog in the courtroom, and the
6    dog went and jumped on the seat and watched
7    the defense attorney, and I just couldn't
8    believe it.  And then the dog -- when the
9    defense attorney got done talking, the dog got
10   out and walked out of the courtroom.
11  BY MR. PEREZ
12      Q   Okay.
13      A   Do you remember that?
14      Q   Yeah.
15      A   I think it was a Schnauzer.
16      Q   That case was back in 2010?
17      A   2010.  We're in 2019.
18      Q   Do you remember what that case was about?
19      A   I don't remember.
20      Q   Okay.  Do you remember Galarza versus
21   Carnival?
22      A   No.
23          THE REPORTER:  Who?
24          MR. PEREZ:  Galarza.
25

Page 79

1  BY MR. PEREZ
2       Q   Yasmine Galarza versus Carnival?
3       A   I don't remember.
4       Q   I deposed you in that one.
5       A   You gotta remember, like memory game, I'm 62
6    years old.  It's quarter of eight.  I'm tired.  I don't
7    remember any of this stuff.  If you want me to comment
8    on those cases, I gotta pull the file.  I mean, once I
9    pull the file, I can do it.
10      Q   Well, let me ask you this:  Were you hired by
11   Mr. Eriksen prior to 2010?
12      A   I don't know.
13          MR. ERIKSEN:  Probably.
14          THE WITNESS:  Probably.  Are we almost
15   done?
16  BY MR. PEREZ
17      Q   Maybe.
18      A   Good.
19      Q   Dr. Lichtblau, what percentage of your time
20   is litigation work?
21      A   Well, that's changing.  If you look on the
22   inside of my Elkins list -- where did we put that?
23   Yours is in shambles.
24      Q   Yeah, mine's a mess.
25      A   Let me get it.  If you look on the inside of

Page 80

1    my Elkins list, 2010 was my busiest year.  I did 50
2    trials and 178 depositions.  I would say that my
3    forensic work was at least 20 percent of my time.  Back
4    in 2017, I took a 54 percent drop in that, I had 15
5    trials and 91 depositions.  In 2018, we're coming up a
6    little bit, I had 27 trials and 108 depositions.  But
7    nowhere near 178.  So I would say it's about 15 -- my
8    guess is about 15 percent of my professional time is
9    forensic work.
10          Now, the breakdown -- I'll give that to you.
11   The breakdown is this:  7.5 percent of the time out of
12   15 percent of the time I'm not an expert witness; I'm
13   the treating physician.  7.5 percent of the time, or
14   half of my forensic experience, I'm an expert.  In this
15   case, I'm an expert.
16          So I would say that it used to be 25 to
17   30 percent of the gross income back in 2010, but I took
18   a 54 percent drop.  So I would say now it's probably 15
19   to 20 percent of my gross income.  I am greater than
20   90 percent on the plaintiff's side due to the nature of
21   the practice, less than 10 percent on the defense side.
22          In that arena the only thing that's changed
23   is, I used to do fraud on the defense side but now I'm
24   getting real cases on the defense side where the
25   patient was actually hurt.  And that is the breakdown.

Page 81

1    Q   Okay.  You previously testified that you've
2  done over 6,000 depositions and over 600 jury trials in
3  your career?
4    A   Yeah.  And that was also corrected because
5  that was an error.  I think we've done over 2600
6  depositions and over 600 jury trials.  I was led astray
7  by an attorney, and I just agreed to it.  Later when I
8  was in open court I think in the center part of the
9  state, the guy had put on the board that I made over
10  $52 million in depositions or something, and I came
11  back and we figured out that that's very wrong.
12  Because let the record reflect, if I made $52 million
13  in depositions, I would be living in Hawaii right now.
14  I would not be here in North Palm Beach working like a
15  dog at 7:45 and started this morning at 6:00 a.m., did
16  four consults, three team conferences, saw, I don't
17  know, 20 patients, and I'm here in deposition at 7:45
18  at night.
19      MR. PEREZ:  All right.  Let's go ahead
20  and mark the Elkins list that he just brought
21  in.
22      THE REPORTER:  That's 10?
23      MR. PEREZ:  That's 10.
24      (Whereupon, Defendant's Exhibit
25  No. 10 was marked for identification.)

Page 82

1      (Whereupon, a brief discussion was
2  held off the record.)
3
4  BY MR. PEREZ
5    Q   Defense Exhibit 10 is the trial and
6  deposition list, Elkins list.
7      Part of what you did was a medical functional
8  capacity assessment?
9    A   Yes.
10    Q   And what you were doing there is trying to
11  get -- trying to determine Ms. Fylling's physical
12  capacity?
13    A   Yes, but in this particular case, I'm trying
14  to determine, you know, what is fair and reasonable for
15  aide and attendant care.  And in this particular case,
16  four hours a day now until age 75; eight hours a day 75
17  to 80; 16 hours a day 80 to death.  Because she has had
18  a mild traumatic brain injury, she is a fall risk.
19      There's over 320,000 hip fractures in the
20  United States in the general population, and depending
21  on the patient's age, 10 percent of those patients die
22  within the first year.  So just to play it safe, I
23  thought four hours, eight hours, 16 hours as a
24  graduated amount of aide and attendant care would be
25  fair and reasonable for this patient.

Page 83

1    Q   Okay.  I want to get back to what you did,
2  though, in terms of the medical functional capacity
3  assessment.  So would you agree that you did some tests
4  with Ms. Fylling, for example, regarding her ability to
5  sit?
6    A   Yes, but what's really important, if you go
7  to Page 32, out of 37, it says here out of 25 expected
8  results from testing, Ms. Fylling met 24 or 96 percent.
9  I'm looking, is she malingering?  Is she symptom
10  magnifying?  Is she a liar, a fake, a cheat, somebody
11  trying to game on the system?  Her coefficient of
12  variation was less than 15 percent or less than 15 on
13  each task.  And this is one of the ways we catch people
14  that are lying, stealing, cheating, and faking.  And
15  you asked me in the start of this deposition, what is
16  malingering and what is symptom magnification?  I don't
17  think she is.  I think she has a problem.  I think she
18  is part of the miserable minority.  And this test helps
19  me to determine whether I'm going to even take the case
20  or not.
21    Q   Okay.  But you would agree that prior to
22  March 4, 2017, Ms. Fylling had several orthopedic
23  issues?
24    A   I agree.
25    Q   For example, she had an Achilles injury?

Page 84

1    A   I agree.
2    Q   She had problems in both her knees?
3    A   I agree.
4    Q   She had problems in her hip?
5    A   I agree.
6    Q   She had problems in her back?
7    A   I agree.
8    Q   That was all before this cruise?
9    A   I agree.
10    Q   Okay.  So, for example, one of the things you
11  were checking is whether she could sit for a prolonged
12  period of time, right?
13    A   Well, I mean, whether she could sit, stand,
14  and basically, she can do anything she wants to do as
15  long as she goes from sit to stand, stand to sit
16  frequently at will.
17    Q   What does that have to do with a brain
18  injury?
19    A   Well, it has a lot to do with a brain injury
20  because she's a fall risk.  Why is she a fall risk?
21  Because she's got headaches, and she's got balance
22  problems.  And I'm going to concede under oath she had
23  preexisting problems, but if you really dissect it
24  under the high power field of a microscope, the
25  frequency, duration, and intensity of these similar

Page 85

1    problems are not the same as they are after subject
2    incident.  That was confirmed by her treating
3    neurosurgeon, her treating primary care physician.
4            So Dr. Lichtblau as a disability evaluating
5    physician with over 130,000 clinical hours of
6    experience, confirmed this with her treating doctors.
7    I'm not operating in a vacuum.  This follows the
8    peer-reviewed, published methodology on how to put this
9    together, and that was published in the American
10   Academy of Physical Medicine and Rehabilitation in
11   February of 2014.  Again, in February of 2015.
12           And, in fact, I have submitted to the
13   International Journal of Physical Medicine and
14   Rehabilitation Methodology, and I'm waiting to hear if
15   I'm going to be published or not, and I will also be
16   published internationally on this topic.
17       Q   Now, the ability to sit down for 20 to 25
18   minutes, would you agree that that's subjective?
19       A   Well, I agree, but you have to realize that
20   if you go to the last page of this, on page -- you go
21   to the medical functional capacity assessment opinion,
22   it says here on Page 4:  It should be understood the
23   medical functional capacity opinion is based on the
24   history obtained from the patient, the physical
25   examination and/or observation of the patient.

Page 86

1        Q   Hold on.  What page are you on?
2        A   Page 4 of the medical functional capacity
3    opinion.  Go to the medical functional capacity
4    assessment opinion.
5        Q   That's not my Page 4.
6        A   The section after that.
7        Q   Got it.
8        A   Okay.  Go to Page 4.  It says:  It should be
9    understood the medical functional capacity opinion is
10   based on the history obtained from the patient, the
11   physical examination or observation of the patient,
12   medical records review, diagnostic impression, over a
13   hundred thousand -- it should say over 130,000 hours of
14   clinical practice experience utilized to correlate the
15   patient's subjective complaints of pain and their
16   demonstrated physical abilities during the medical
17   functional capacity assessment.  Each component of the
18   aforementioned is utilized to determine the patient's
19   medical functional capacity.
20           So what's important, if you go to that page
21   that I was talking about, which is Page 32 out of 37,
22   there's a validity check there.  There's also a
23   validity check, cross reference validity on Page 36 out
24   of 37.  And she did everything we asked her to do.
25           If you go to Page No. 37 out of 37,

Page 87

1    repetitive kneeling, she's got bad knees.  I told her
2    not to do it.  Lifting from the floor to waist,
3    attempted.  But, you know, I didn't want her to really
4    do that or be aggressive because I don't want her to
5    hurt herself.  Lifting floor to shoulder, bilateral
6    carry.  Those are the things that she didn't do, and
7    she complained of headache, winded, and fatigue.  I
8    have no reason to disbelieve the patient.
9            So I think this test is valid.  She met the
10   parameters for a valid test.  I observed her.  I looked
11   at her body habitus.  I looked at the history.  I
12   performed a physical examination.  I watched the
13   medical functional capacity assessment.  I mean, do you
14   have to give her aide and attendant care in the most
15   probable case scenario?  No, you don't.  But the spirit
16   and the intent of this continuation of care plan is to
17   compress morbidity.
18           What that means, what do we have in 2019
19   to decrease this patient's pain and suffering.  And the
20   goal of the continuation of care plan is to take
21   disability to ability, illness to health, and
22   hopelessness to hope.  And this is the spirit and the
23   intent of what we're trying to do.
24           So if you don't care about that, then you
25   drop out the most probable case scenario and give her

Page 88

1    nothing.  If you care about that, then that's what you
2    give her, nothing more, nothing less.  The issue in
3    this case is causation.  But if you look and follow
4    peer-reviewed, published literature and you really look
5    at the timeline, the frequency, duration, intensity of
6    her problems and you talk to the treating physicians
7    that took care of her prior to subject accident and
8    after subject accident, what you realize is she's part
9    of the miserable minority regardless of meningioma,
10   regardless of AV malformation, regardless of the
11   puncture, regardless of her being in the ICU,
12   regardless of her going through rehab.
13           Her complaints are the same after subject
14   accident as they are -- or her complaints after subject
15   accident are the same.  They have remained the same.
16   So if you peel away all of the insignificant stuff,
17   it's very transparent.  It's very obvious as to what
18   her problem is.
19           Now, what raises my question is your defense
20   IME neurosurgeon who has all of these credentials,
21   basically said without a loss of consciousness, Glasgow
22   Coma Scale, this patient cannot have a post-concussion
23   syndrome.  He doesn't even mention the miserable
24   minority which is in the literature.  That's like me
25   trying to tell a Ph.D. in mathematics at Harvard that

22 (Pages 85 to 88)

Page 89

1  one plus one equals 37. Well, I'm not a Ph.D. in math,
2  and I'm not a math professor at Harvard, but I can tell
3  you I know one plus one does not equal 37 or 7. One
4  plus one equals two.
5      The literature backs me up on this. This is
6  consistent with my clinical practice experience, and
7  some of the statements in your defense IME doctor's
8  report are inconsistent with the literature, and this
9  is peer-reviewed, published university based
10  literature. This is not Craig Lichtblau literature out
11  of People Magazine or Reader's Digest. This is the
12  real stuff. So I believe that this case is extremely
13  straightforward.
14      Q   Are you referring to the literature we've
15  already marked?
16      A   Yes. And, I mean --
17      Q   I just want to make sure you're not going to
18  have more articles later on.
19      A   No, I don't have any surprises for you.
20      Q   All right.
21      A   I'm not allowed to do that in a court of law
22  anyway. This is your discovery depo.
23      Q   Right.
24      A   And I have been very cooperative.
25      THE WITNESS: Haven't I, Mr. Eriksen?

Page 90

1      MR. ERIKSEN: Yes, sir.
2  BY MR. PEREZ
3      Q   You have been.
4      So in terms of Ms. Fylling's gait, you found
5  her gait was normal?
6      A   Yes.
7      Q   Okay. On Page 4 of the opinion section that
8  we just talked about --
9      A   Yes.
10      Q   -- that last paragraph, you state: It is my
11  medical opinion as a board certified physiatrist this
12  patient will be unable to maintain gainful employment
13  in the competitive open labor market or in a sheltered
14  environment with a benevolent employer secondary to
15  acute intermittent exacerbations of chronic pain,
16  headaches, and cognitive deficits.
17      A   I agree.
18      Q   Now, none of the testing that you did
19  actually measures any of those three components?
20      A   No, I agree with you. That has nothing to do
21  with the physical functional capacity. The physical
22  functional capacity has to do with the aide and
23  attendant care and looking at the overall picture.
24  Realize, going back down to that paragraph, these
25  opinions have a lot to do with, you know, it's

Page 91

1  multifaceted. It's not just what she can lift and what
2  she can squeeze.
3      Q   Okay. Are you giving an opinion that she
4  wouldn't have needed aide and attendant care regardless
5  of the shipboard incident?
6      A   Yeah, I don't think so.
7      MR. ERIKSEN: Let me object to the form
8  of that question because it's confusing to me.
9      THE WITNESS: Well, I think the -- go
10  ahead.
11  BY MR. PEREZ
12      Q   Let me rephrase it.
13      Is it your opinion that if this shipboard
14  incident had not occurred, Ms. Fylling would not have
15  needed aide and attendant care?
16      A   That's correct. It's my opinion that this
17  shipboard incident was the major contributing cause to
18  this patient's impairment, disability, and cause for
19  future medical care as I have defined it as it relates
20  to subject incident. I'm applying the peer-reviewed,
21  published literature on causation. And I am looking at
22  this case in its entirety, which includes that prior to
23  the shipboard incident, she did not have
24  post-concussive syndrome. After shipboard incident,
25  she had a post-concussive syndrome. Prior to all of

Page 92

1  the surgery that she had and all the complications that
2  she had that have nothing to do with the shipboard
3  injury, she had the post-concussive syndrome.
4      After all of that meningioma, AV
5  malformation, puncture of the vessel, ICU, getting
6  better, she has the same post-concussive syndrome.
7  That is backed by her treating neurosurgeon, her
8  primary care physician, and if you look at the facts of
9  the case, that's exactly what this case is all about.
10  It's very straightforward.
11      Q   And your basis for the aide and attendant
12  care is because you believe that she's a fall risk?
13      A   I do believe she's a fall risk, yes.
14      Q   I'm just saying, that's the basis for this?
15      A   Yes, I do.
16      Q   Okay. Who's taking care of her right now?
17      A   Well, I think there's a problem right now
18  because her husband had a stroke and she used to take
19  care of her husband, and now her husband is not in a
20  position to take care of her. So I don't have an
21  answer to your question. I'm not going to speculate
22  under oath. And I believe, if I'm not mistaken, I
23  don't know that she's having any help right now, and I
24  think that puts her at great risk, especially because
25  her husband is out of the picture, and he's completely

23 (Pages 89 to 92)

Page 93

```
 1   out of the picture.
 2       Q.  Ms. Fylling's husband had medical issues
 3   prior to the cruise, right?
 4       A.  I believe so.
 5       Q.  Okay.  Well, did you know that on the
 6   cruise -- well, let me ask you this:  Was Ms. Fylling's
 7   husband in a wheelchair prior to the cruise?
 8       A.  I believe so.
 9       Q.  Okay.  So he wasn't the one taking care of
10   her prior to the cruise?
11       A.  No, she was taking care of him.  Now I don't
12   think she has the physical functional capacity to do
13   that.
14       Q.  Going over to your continuation of care most
15   probable case scenario section, who is making these
16   recommendations?  Is this you yourself?
17       A.  What are you talking about?
18       Q.  Continuation of care.
19       A.  Oh, this is -- these are my opinions based on
20   my own knowledge, training, clinical practice
21   experience, talking to Dr. Jody Abrams, talking to
22   Antoinette Dakouny, talking to the treating
23   neurosurgeon, which is Dr. Brian Hudson.  Talking to
24   Steven Pollard, a psychologist.  And I think I'm
25   missing one.  Did I say Dr. Dakouny?  Brian Hoh, that's
```

Page 94

```
 1   who I was missing.  Also speaking to Brian Hoh.
 2       So the continuation of care is based on my
 3   own knowledge, training, clinical practice experience,
 4   peer-reviewed, published literature.  I think in this I
 5   have -- let me just make sure I'm not making a mistake
 6   here -- 17, 18, 19, 29, 39, 40, 41, 42, 43, 45, 46, 47,
 7   48, 58, 68, 75, 85, 86, 86 plus 5 is 91.  And you know
 8   what, I forgot to put the section on falls and the
 9   elderly.  I'm going to have over a hundred
10   peer-reviewed, published articles backing up my
11   opinions as to the need for the most probable case
12   scenario.
13       Q.  Okay.
14       A.  So I do not operate in a vacuum.  This is
15   based on knowledge, training, clinical practice
16   experience which exceeds over 130,000 hours, over 6,500
17   admissions to a level one trauma hospital, over 3,000
18   intensive care unit consultations, over 38,000
19   outpatients, and 101 peer-reviewed, published articles.
20   There's an awful lot that goes into this, defining
21   this, understanding this, and it's the peer-reviewed,
22   published literature that backs up my opinions.
23       Q.  All right.  So for the continuation of care
24   plan that you drafted here, you spoke to Dr. Abrams?
25       A.  I did.
```

Page 95

```
 1       Q.  You spoke to Dr. Dakouny?
 2       A.  I did.
 3       Q.  Did you speak to Dr. Dannenbaum?
 4       A.  Dannenbaum, wasn't that your defense --
 5       Q.  Right.
 6       A.  I'm not allowed to speak to the defense IME
 7   expert.
 8       Q.  Did you ask to speak to him?
 9       A.  That's illegal.  I was told by my counsel
10   never speak to the defense experts.  You're going to
11   get in trouble.  You'll get in big trouble.
12       Q.  Did you ask Mr. Eriksen if you could reach
13   out to our doctors?
14       A.  Well, maybe I'm wrong.  My understanding is
15   I'm not allowed to do that.  I'm not allowed to talk to
16   them, period.  So I didn't ask Mr. Eriksen that, and
17   he's going to think I'm an idiot.
18       Q.  I just want to make sure, you didn't speak to
19   any of the defense doctors?
20       A.  No, I'm not allowed to do that.
21       Q.  So the only people that you spoke to and the
22   only people that are supporting these conclusions here
23   are the plaintiff's doctors?
24       A.  Well, wait a minute.  The treating physicians
25   are not plaintiff's doctors.  I mean, they had a
```

Page 96

```
 1   doctor/patient relationship.  They're not paid experts.
 2   My understanding is her treating neurosurgeon saw her
 3   way before the shipboard accident.  Dr. Brian Hudson I
 4   don't think is an expert.  Maybe I'm wrong.  Dr. Hoh is
 5   a treating neurosurgeon at the University of Florida.
 6   He's not a plaintiff expert doctor.  And then
 7   Dr. Dakouny I believe is the treating internist.  I
 8   don't think she's -- I don't think she's a plaintiff
 9   expert, unless I'm wrong.
10       MR. ERIKSEN:  It's a he.
11       THE WITNESS:  He.  I keep saying him.
12   Antoine, I think Antoinette.  No, these people
13   are not paid experts by Dr. Eriksen to my
14   understanding.  Maybe I'm wrong.
15       MR. ERIKSEN:  I'm not a doctor.
16       THE WITNESS:  Mr. Eriksen, they're not
17   paid experts.  I spoke to the treating
18   physicians.  I followed the peer-reviewed,
19   published literature on methodology on how to
20   put this together using my own knowledge,
21   training, clinical practice experience,
22   checking with the treating physicians and
23   looking at peer-reviewed, published university
24   based literature.
25
```

24 (Pages 93 to 96)

Page 97

1    BY MR. PEREZ
2      Q   Do you know if Ms. Fylling selected those
3    doctors or was referred to them?
4      A   I have no idea.  Usually you're referred to a
5    neurosurgeon, though.  I can't sit here under oath and
6    say a lawyer sent her to a neurosurgeon.  I mean, you
7    sent her to your own expert, but that's an expert.  I
8    don't know that a lawyer sent her to the treating
9    neurosurgeon.  I would find that unusual.  She had that
10   treating neurosurgeon way before she hired Mr. Eriksen.
11       (Whereupon, a brief recess was
12       taken.)
13   BY MR. PEREZ
14     Q   All right.  So you mentioned a couple times
15   some conversations that you had with some of the
16   doctors which are included in the documents that you
17   provided.  So December 7, 2018, you wrote a note
18   summarizing your discussion with Dr. Hudson?
19     A   Yes, and you notice he signed it and faxed it
20   back so it's pretty accurate.  No funny business.
21     Q   I was just going to ask you that.  I don't
22   have that.
23     A   Yeah, here it is.  I agree with the letter.
24   That's because you're tearing the chart up.
25     Q   No, that wasn't included in the papers I was

Page 98

1    given.
2      A   Signed.
3      Q   All right.  So on December 14, 2018,
4    Dr. Hudson wrote back or faxed back?
5      A   Yeah, correct.
6      Q   What about Dr. Hoh?
7      A   Dr. Hoh did not fax it back.
8      Q   Did you speak to Dr. Hoh?
9      A   Yes, I did.
10     Q   And did you receive any confirmation from
11   Dr. Hoh regarding your November 13, 2018 note?
12     A   No, but I said the same thing.  I asked him
13   to read the dictation.  If it's not exactly what was
14   discussed and agreed upon, please contact my office
15   immediately.  He never did.
16     Q   Okay.
17     A   Same thing with Dr. Dakouny, she never
18   contacted me back.
19       MR. ERIKSEN:  It's a he.
20       THE WITNESS:  He.
21   BY MR. PEREZ
22     Q   So your documented telephone conference with
23   Dr. Hoh which you wrote November 13, 2018, that last
24   paragraph on that first page, you indicated Dr. Hoh
25   stated there's a possibility that this patient could

Page 99

1    have some headaches and cognitive deficits secondary to
2    the concussion that was sustained on the cruise ship
3    and the embolization and bleed from the attempted
4    embolization that took place in Tampa; is that right?
5      A   I agree.
6      Q   So it's a possibility?
7      A   Yes.
8      Q   Did you speak to Dr. Hoh any further about,
9    you know, whether or not it was within a reasonable
10   degree of medical certainty?
11     A   No, but what he did say from his perspective,
12   the procedure that he performed he did not see a
13   significant clinical sequella.  So the fixing of the AV
14   malformation puncture, he embolized it.  He doesn't see
15   any cognitive deficits.  He doesn't see any secondary
16   effects.  That's what's important from my perspective
17   from him.
18     Q   Okay.  Did Dr. Hoh tell you that the AV
19   fistula surgery was a purely elective procedure?
20     A   Yes.
21     Q   Okay.
22     A   But that has nothing to do with subject
23   accident.  I mean, the AV malformation is irrelevant.
24     Q   Okay.  You also have a November 13, 2018 note
25   documenting your telephone conference with Dr. Dakouny?

Page 100

1      A   Yes.
2      Q   Okay.  Is it correct that you indicated here
3    Dr. Dakouny could not state to a reasonable degree of
4    medical certainty whether her deficits are a direct
5    result of the concussion and she is part of the
6    miserable minority or is it a combination of the
7    concussion and the embolization with the perforation of
8    the vessel and the bleed?
9      A   I agree.
10     Q   Okay.  So Dr. Dakouny couldn't tell you
11   within a reasonable degree of medical certainty whether
12   Ms. Fylling's deficits were related to the concussion?
13     A   I agree.
14     Q   All right.  That's her treating primary care
15   physician?
16     A   Correct.
17     Q   All right.  November 14, 2018, you provided
18   us with a documented telephone conference note, your
19   conversation with Dr. Steve Pollard?
20     A   Yes.
21     Q   Okay.  And did Dr. Pollard tell you that
22   Ms. Fylling's verbal and intellectual abilities
23   improved in the last year?
24     A   Yes, but you know, you're only giving me half
25   the statement.  However, she still has deficits in her

25 (Pages 97 to 100)

Page 101

1  executive functioning, attention, mental manipulation.
2      Q   Okay.  Did you do the same thing for a
3  telephone conference that you had with Dr. Jody Abrams?
4      A   Yes.
5      Q   Okay.  And did Dr. Abrams tell you with
6  respect to whether or not Ms. Fylling would need
7  therapy and prisms?  What's prisms?
8      A   Special glasses.
9      Q   Okay.  With respect to whether or not she
10  would need therapy and prisms for -- I guess for her
11  ophthalmological condition, that remains to be seen?
12      A   Correct.  And she said it has nothing to do
13  with -- they're secondary to the aneurysm and the
14  resulting bleed that took place so that has nothing to
15  do with the ship.
16      Q   Okay.
17      A   The ship's accident.
18      Q   I think I might be done.
19      A   That would be music to my ears.
20          MR. PEREZ:  Yes, I have no further
21  questions.
22          CROSS EXAMINATION
23  BY MR. ERIKSEN:
24      Q   Just in case there's a Daubert motion, we got
25  to do some stuff.

Page 102

1      A   Let's do it.  I'll give it to you in 30
2  minutes.
3      Q   But I need some short, direct answers.
4      A   I'll give them to you.
5      Q   And I'll ask all the questions that I think
6  are necessary.
7      A   Just give me yes, nos because I'm tired.
8      Q   How long have you been going today, Doctor?
9      A   Since 6:00 a.m.
10      Q   And what time is it now?
11      A   It is 8:10.
12      Q   When we get done tonight, will you be done?
13      A   No, no, I still have an interview and I have
14  to go to the hospital.
15      Q   What hospital?
16      A   St. Mary's.
17      Q   Have you got a history with St. Mary's
18  Hospital?
19      A   Yes.
20      Q   Describe that history briefly.
21      A   Well, July 25, 1956 I was born there.  Then I
22  came back and got staff privileges there in June of
23  1989.  I was the medical director to the inpatient
24  rehab unit from March 12, 1990 until March of 2006.  I
25  still have maintained privileges there and I opened the

Page 103

1  inpatient pediatric rehab unit at our level one trauma
2  hospital, and I've been on staff there for almost 30
3  years.
4      Q   Is St. Mary's the local level one hospital?
5      A   Yes, that is the level one trauma center.  It
6  is at 9th and Gun Club.
7      Q   What is your medical speciality?
8      A   Physical medicine and rehabilitation.  I take
9  care of patients that suffer from traumatic brain
10  injury, spinal cord injury, stroke, amputation, burns,
11  multiple orthopedic trauma, patients that suffer from
12  progressive neurologic diseases such as MS, ALS,
13  stroke, amputations, multiple orthopedic trauma,
14  patients that suffer from musculoskeletal pain and
15  disability.
16      Q   Are you board certified?
17      A   I am board certified in physical medicine and
18  rehabilitation.  I have my subspecialty boards in
19  traumatic -- in brain injury medicine.
20      Q   I haven't asked you that yet.  Let me ask you
21  a step at a time.
22      A   Yeah.
23      Q   So what is the name of the board that
24  certifies you?
25      A   American Board of Physical Medicine &

Page 104

1  Rehabilitation, it was started in 1946.
2      Q   When did you become board certified as a
3  specialist in rehabilitative medicine?
4      A   May of 1991.
5      Q   So how many years has it been since you've
6  been board certified?
7      A   You're asking me to do math after a 14-hour
8  day.  May of 1991 to 2019.
9      Q   I'm going to hand you a document.  Does your
10  board have a publication called the PM&R?
11      A   Yes.
12      Q   What is that?
13      A   Physical Medicine and Rehabilitation.
14      Q   Is that a medical journal?
15      A   Yes.
16      Q   Is it peer reviewed?
17      A   Yes.
18      Q   I'm going to hand you a document that comes
19  from your organization, the board that certifies you,
20  entitled, quote, what is a physiatrist, end quote.
21  Have you seen this before?
22      A   Yes.
23      Q   This is Exhibit 1.  Can you look it over?
24  Does that accurately describe generally what your
25  specialty does?

26 (Pages 101 to 104)

Page 105

1    A   Yes.
2    Q   By the way, let's make that Plaintiff's
3  Exhibit 1.  So I'll just call them Plaintiff's exhibits
4  from now on.
5        (Whereupon, Plaintiff's Exhibit No. 1
6        was marked for identification.)
7  BY MR. ERIKSEN:
8    Q   Now, you mentioned that you have been
9  affiliated with St. Mary's Hospital; do you have
10  admitting privileges there?
11   A   I do.
12   Q   How long have you had admitting privileges?
13   A   Since June of 1989.
14   Q   And in addition to the work that you have
15  done at the hospital, or that is hospital based, you
16  also have an office practice?
17   A   Yes, since September 22, 1989.
18   Q   Is that where we're sitting right now?
19   A   Yes.
20   Q   What does that office practice consist of and
21  what does it do?
22   A   Well, we have 10,000 square feet, nine
23  incoming lines, 25 employees, and we provide all rehab
24  services under one roof.
25   Q   Okay.  Now, you told us earlier that you --

Page 106

1  in addition to being board certified in physical
2  medicine and rehabilitation, you also hold a board
3  certification in brain injury medicine.  Is that a
4  certification issued by the same board, the board of
5  physical medicine and rehabilitation?
6    A   Yes, it's a subspecialty board.  I met the
7  criterion and passed the test.
8    Q   All right.  Do you just have to pass a test
9  or do you have to have some degree of experience in the
10  field?
11   A   No, you have to have some experience and you
12  have to have a percentage of your practice dealing with
13  traumatic brain injury.
14   Q   All right.  So let's go back to St. Mary's
15  Hospital.  Were you at one point in time the director
16  of the rehabilitation unit there?
17   A   Yes, for 16 years I was the medical director.
18  It started out I think 21 beds and on July 24, 1997 we
19  pushed it to 50 beds.  I was the medical director to a
20  50-bed rehab unit.
21   Q   What type of patients would come in there
22  with specific emphasis on brain injuries, acquired
23  brain injuries?
24   A   I would say 25 percent were acquired brain
25  injuries, motor vehicle accidents, motorcycle

Page 107

1  accidents, airplane accidents, gun shots to the head,
2  explosions, dynamite accidents, boating accidents,
3  fights.  Everything that you can imagine I've seen
4  including --
5    Q   You used the term acquired brain injury.
6  Does that also include things like strokes?
7    A   Yes, strokes, tumor removals, hydrocephalous.
8  There isn't too much I haven't seen after 29 years.
9    Q   What is your experience over 29 years in
10  diagnosing and treating people with concussions?
11   A   It's vast because the most common type of
12  brain injury is mild traumatic brain injury or
13  concussion.
14   Q   Okay.  Now, is one of the things that you did
15  in this case at my request to conduct life care
16  planning for Ms. Fylling?
17   A   Yes, but I call it a continuation of care
18  plan.
19       MR. ERIKSEN:  Okay.  I'm going to mark
20  another journal as Plaintiff's Exhibit 2.
21       (Whereupon, Plaintiff's Exhibit No. 2
22       was marked for identification.)
23       MR. ERIKSEN:  I'll ask the court reporter
24  or somebody to pass that down.  I'll give a
25  copy to counsel.

Page 108

1        MR. PEREZ:  Thank you, sir.
2        MR. ERIKSEN:  Wait a minute, let me see
3    that back a second.
4  BY MR. ERIKSEN
5    Q   Is that a journal article published in the --
6    A   American Academy of Physical Medicine and
7  Rehabilitation.  This is the article that I alluded
8  to --
9    Q   Okay.
10   A   -- in Defense Counsel's examination.  This is
11  the one in February of 2014.  This is peer-reviewed,
12  published and accepted.  In fact, the author of this
13  article, Andrea Zotovas, worked in this office for ten
14  years.
15   Q   Okay.  You didn't let me finish my question.
16  My question was:  Is this article that we marked as
17  Plaintiff's Exhibit 2, was that published in the PM&R
18  medical journal?
19   A   Yes.
20   Q   Is that the journal of the board that
21  certifies you?
22   A   Yes.
23   Q   Is that journal peer reviewed?
24   A   Yes.
25   Q   And does it lay out the --

Page 109

1    A   It lays out the methodology.
2    Q   That's what -- let me finish the question.  I
3  was going to get -- I actually was going to get to the
4  word methodology.  I know we're in a hurry here but let
5  me ask the questions.
6        So does this article lay out the methodology
7  that you follow when you do continuation of care
8  planning for people like Ms. Fylling?
9    A   Yes.
10   Q   And does it have a step wise procedure that
11 you go through to do that?
12   A   Yes.
13   Q   And did you apply this specific step wise
14 methodology in generating a continuation of care plan
15 for Ms. Fylling?
16   A   I did.
17   Q   Is one of the steps in doing a care plan in a
18 forensic setting for somebody like Ms. Fylling to go --
19 to take a history, do an exam and review medical
20 records to determine what specific current conditions
21 the patient has that were caused by the incident that
22 the case is about?
23   A   Yes.
24   Q   Is that inherent in the process?
25   A   Yes.

Page 110

1    Q   And did you do that in this case?
2    A   Yes.
3    Q   Now, in terms of determining whether a
4  specific event or a specific condition was caused by a
5  specific event, do you have a methodology to make that
6  determination?
7    A   Yes.
8        MR. ERIKSEN:  I'm going to mark another
9  article as Exhibit 3, Plaintiff's Exhibit 3.
10       (Whereupon, Plaintiff's Exhibit No. 3
11       was marked for identification.)
12       MR. ERIKSEN:  I'm going to hand that to
13       you and I'll give a copy to counsel.
14 BY MR. ERIKSEN
15   Q   And I'll ask you whether or not this article
16 is published or was published in the PM&R medical
17 journal that we talked about before, that is the
18 journal of your board?
19   A   Yes.
20   Q   And does it lay out a three-step methodology
21 to make causation determinations?
22   A   Yes.
23   Q   And I think you alluded to that, those three
24 steps earlier, but one of them is biologic
25 plausibility?

Page 111

1    A   Yes.
2    Q   Is that what we call general causation; in
3  other words, whether an exposure to an event or a
4  trauma can, in general, cause a condition?
5    A   Yes.
6    Q   And then the second step in the methodology
7  is something called temporal association?
8    A   Yes.
9    Q   What does that mean?
10   A   Timing.
11   Q   Okay.  So does that element refer to the
12 onset of symptoms in relation to the event?
13   A   Yes.
14   Q   And then the third step is lack of likely
15 alternative explanations?
16   A   That's correct.
17   Q   Generally what -- specifically and generally
18 and briefly, what does that mean?
19   A   That means making sure that one plus one
20 equals two and it's not something else.
21   Q   You've said that more than once in the
22 deposition, but is that basically -- does that relate
23 in some way to the differential diagnosis approach?
24   A   Yes.
25   Q   Where you got a set of signs and symptoms and

Page 112

1  you want to make a list of possible causes of that and
2  then you attempt to rule them out one by one to get to
3  the most probable cause?
4    A   Yes.
5    Q   Did you do that in this case?
6    A   We did.
7    Q   All right.  So now this article, the title of
8  this article is, quote, A Systematic Approach to
9  Clinical Determinations of Causation and Symptomatic
10 Spinal Disk Injury Following Motor Vehicle Crash
11 Trauma, end quote.  But in that article, do the authors
12 state that this is a general causation methodology
13 applicable to multiple types of medical conditions, not
14 necessarily just those in motor vehicle crashes?
15   A   That is correct.
16   Q   I mean, do you apply -- also this article
17 relates to spinal disks.  Do you routinely apply this
18 three-step causation methodology to types of injuries
19 that have nothing to do with the spine?
20   A   I agree.
21   Q   Does that include brain injuries?
22   A   Yes.
23   Q   Is that what you did in this case?
24   A   Yes.
25   Q   All right.  So let's talk about the -- was

28  (Pages 109 to 112)

Page 113

1  the primary diagnosis that Ms. Fylling had right after
2  the fall and the head strike on the cruise ship a
3  concussion?
4      A  I agree.
5      Q  What is a concussion?
6      A  It's a mild traumatic brain injury.
7      Q  All right.  So are you familiar with what
8  happens to a brain when a skull hits a hard surface
9  like a floor to produce a concussion?
10     A  Yes, what happens, the brain floats in CSF
11 and it bounces around inside the skull.  You don't even
12 have to hit your head to have a concussion because you
13 could have a whiplash type situation where your brain
14 bounces inside the hard skull and your head doesn't hit
15 anything.
16     Q  I'm going to show you a video of the
17 incident, and I think you've seen this before.
18     A  I have.  I have seen it.
19     Q  Just look over my shoulder.  I'll open up my
20 laptop.
21         MR. ERIKSEN:  Just for the record, this
22     is on a thumb drive that we have marked as
23     Exhibit 5 in a series of corporate depositions
24     that we've taken in this case.
25

Page 114

1  BY MR. ERIKSEN
2      Q  Can you see this?
3      A  Yeah.  I can see it.
4      Q  If you need to take a break.
5      A  No, I need to turn a light on.
6         MR. ERIKSEN:  JC, can we agree that what
7     I'm showing here is the video of the incident?
8         MR. PEREZ:  Yes.
9         MR. ERIKSEN:  Okay.  All right.
10 BY MR. ERIKSEN
11     Q  And we've used this video in multiple
12 depositions already so I'm just going to play it.  It
13 just takes us a second.
14         (Whereupon, the video was played.)
15         THE WITNESS:  Here she comes.
16 BY MR. ERIKSEN
17     Q  All right.  So did you just see the incident
18 take place?
19     A  Yes.
20     Q  Does her head bounce off the hard floor?
21     A  Yes.
22     Q  Is that type of head strike capable of
23 producing a concussion in a 69-year-old woman?
24         MR. PEREZ:  Form.
25         THE WITNESS:  Yes.

Page 115

1  BY MR. ERIKSEN
2      Q  Now, I think you were about to tell us what
3  happens inside the skull to the brain when the skull
4  makes a sudden stop or impact on a floor like that; can
5  you explain?
6      A  Yes, the head bounces around inside the skull
7  and you --
8      Q  Does the brain bounce around inside the
9  skull?
10     A  Yes, what happens is you have shearing forces
11 that cause axonal shearing that may not even show up on
12 a film, MRI, DTI, CT scan.
13     Q  Does the skull stop but the brain doesn't
14 when there's an impact like that?
15     A  Correct.
16     Q  And can you describe the architecture of the
17 inside of the skull?  Is it smooth or is it not smooth?
18     A  It's bony and full of ridges.  The brain
19 bounces around in there and what happens is when the
20 brain hits one side of the skull, it's called coup
21 contrecoup as --
22         THE REPORTER:  It's called what?
23         THE WITNESS:  Coup, C-O-U-P, something --
24     it's coup contrecoup, it's French.  And the
25     brain can actually be bruised on one side and

Page 116

1      then bruised anteriorly and posteriorly or
2      both lateral sides.  And this can cause a
3      contusion in the brain and that contusion may
4      not even show up on film.
5  BY MR. ERIKSEN
6      Q  Does that describe a cellular level damage to
7  the brain tissue?
8      A  Yes.  You can have cellular level and what
9  happens is you have a lack of ATP which is the energy
10 producing -- or the energy which is consumed by
11 individual cells and that goes down.  The mitochondria
12 don't produce enough ATP and you have cellular damage.
13     Q  Just give me a second here.  I know we're in
14 a hurry.  I'm trying to find an exhibit that I brought
15 in.
16     A  Well, we're not in that much of a hurry.
17     Q  Okay.
18         MR. ERIKSEN:  Okay.  I'm going to hand
19     you a photograph of Ms. Fylling that was taken
20     shortly after the incident.  I'm marking that
21     as Exhibit 4.
22         (Whereupon, Plaintiff's Exhibit No. 4
23         was marked for identification.)
24 BY MR. ERIKSEN
25     Q  While she was still on the ship.  Does she in

29 (Pages 113 to 116)

Page 117

```
 1    that exhibit show any external signs of trauma?
 2       A   Yes.  Obviously, her left eye is swollen.
 3    She's also got ecchymosis.  She's got a black eye.
 4       Q   Right.  And so is that external appearance of
 5    her face consistent with having sustained a concussion?
 6          MR. PEREZ:  Form.
 7          THE WITNESS:  Yes.
 8    BY MR. ERIKSEN
 9       Q   Explain.
10       A   Well, obviously she has external trauma to
11    her face and behind the face is the skull and behind
12    the skull is the brain.
13       Q   So let's go through these different three
14    steps of causation methodology as you applied them to
15    this case.  And I think you said that the initial
16    diagnosis that was reached by the general practitioner
17    shortly after she returned from the cruise was that of
18    concussion?
19       A   Correct.
20       Q   Have you reviewed the medical records not
21    only of him, but also the neurosurgeon she was
22    eventually referred to?
23       A   Yes.
24       Q   And have you taken a history from her that is
25    relevant to a determination as to whether or not she
```

Page 118

```
 1    sustained a concussion or not?
 2          MR. PEREZ:  Form.
 3          THE WITNESS:  I did.
 4    BY MR. ERIKSEN
 5       Q   Are you capable yourself without regard to
 6    somebody else's medical records to make that diagnosis?
 7       A   Yes.
 8       Q   Did you personally and independently make the
 9    determination to a reasonable degree of medical
10    probability that the head strike this woman suffered on
11    March 4th of 2017 on the cruise ship caused her to
12    sustain a concussion?
13       A   I did.
14       Q   Now --
15       A   And I did see that videotape.
16       Q   Okay.  So you talked earlier in the
17    deposition about the opinion of the -- one of the
18    defense doctors who is Dr. Dannenbaum out of Texas,
19    that you can't sustain what amounts to a permanent or
20    persistent post-concussion syndrome without either a
21    loss of consciousness or a reduced Glasgow Coma Scale?
22          MR. PEREZ:  Form.
23          THE WITNESS:  That was his opinion, but
24       that's inconsistent with peer-reviewed
25       literature.
```

Page 119

```
 1    BY MR. ERIKSEN
 2       Q   Let's talk about some of the medical
 3    literature.
 4          MR. PEREZ:  This can be off the record.
 5          (Whereupon, a brief discussion was
 6       held off the record.)
 7          MR. ERIKSEN:  I'm now marking Exhibit 5.
 8          THE WITNESS:  That was Defense Exhibit 6,
 9       post-concussive syndrome.
10          MR. ERIKSEN:  I'm going to do this
11       separately.  I'll put some in your pile that
12       you gave him and he marked and included in
13       what I'm about to do, but let's just be
14       specific.  So I'm handing you Plaintiff's
15       Exhibit 5.
16          (Whereupon, Plaintiff's Exhibit No. 5
17       was marked for identification.)
18          THE WITNESS:  Yes.
19    BY MR. ERIKSEN
20       Q   Now, is that a publication of the Mayo
21    Clinic?
22       A   Yes.
23       Q   What is the Mayo Clinic?
24       A   Well, it's an internally known clinic.
25       Q   Is that a source of reliable medical
```

Page 120

```
 1    information on different topics?
 2          MR. PEREZ:  Form.
 3          THE WITNESS:  I think so.
 4    BY MR. ERIKSEN
 5       Q   Is the topic of this publication by the Mayo
 6    Clinic, quote, Post-Concussion Syndrome, end quote?
 7       A   Yes.
 8       Q   And if you look back on the very last page of
 9    Plaintiff's Exhibit 5, if you look about two-thirds of
10    the way down, is there a date indicated there for this
11    publication?
12       A   Yes, 2/10/2019.  Am I right?
13       Q   That's actually the date it was downloaded.
14    I would ask you to look about two-thirds down the page.
15    Does it say July 28, 2017?
16       A   Yes.
17       Q   Okay.  Is that a fairly recent publication?
18       A   Yes.
19       Q   And let me just ask you about fairly recent
20    publications.  Has the body of medical literature on
21    the persistence of post-concussion syndrome evolved in
22    the last five to ten years?
23       A   Absolutely.
24       Q   And has the prevalence of mild traumatic
25    brain injuries in the Afghanistan and Iraq wars have
```

Page 121

1  anything to do with that?
2     A   It had everything to do with it.
3     Q   As a result of those events and those wars,
4  has the U.S. Government pumped a lot of research
5  dollars into trying to make more sense of mild
6  traumatic brain injury and post-concussion syndrome?
7     A   They have.
8     Q   So as a result of that, has the conventional
9  wisdom about mild traumatic brain injury and
10 post-concussion syndrome among the medical community
11 evolved as well?
12        MR. PEREZ:  Form.
13        THE WITNESS:  It has.
14 BY MR. ERIKSEN
15    Q   So if you take a look at Plaintiff's
16 Exhibit 5, which is from the Mayo Clinic entitled,
17 quote, Post-Concussion Syndrome, end quote, dated
18 July 28, 2017, does the Mayo Clinic there make the
19 following statements?  And let's just go through them
20 one-by-one.
21        Does it there say, quote, post-concussion
22 syndrome is a complex disorder in which various
23 symptoms such as headaches and dizziness last for weeks
24 and sometimes months after the injury that caused the
25 concussion, end quote?

Page 122

1     A   Yes.
2     Q   Does it go on to say, quote, concussion is a
3  mild traumatic brain injury that usually happens after
4  a blow to the head, end quote?
5     A   Yes.
6     Q   Does it then go on to say, and I quote, you
7  don't have to lose consciousness to get a concussion or
8  post-concussion syndrome.  In fact, the risk of
9  post-concussion syndrome doesn't appear to be
10 associated with the severity of the initial injury, end
11 quote?
12    A   That's correct.
13    Q   Is that the current conventional wisdom
14 amongst the medical community about whether or not one
15 needs to lose consciousness to get either a concussion
16 or post-concussion syndrome?
17    A   That is true.
18    Q   Is that -- in addition to the Mayo Clinic
19 saying it, is that concept also supported by studies
20 that have been done to make that very determination?
21    A   That is correct.
22    Q   We're going to talk about some of those in a
23 minute.  Does the Mayo Clinic go on to say, quote, in
24 most people symptoms occur within the first seven to
25 ten days and go away within three months, sometimes

Page 123

1  they can persist for a year or more, end quote?
2     A   That's correct.
3     Q   And as it relates to that last sentence,
4  quote, sometimes they can persist for a year or more,
5  end quote, does that refer to this miserable minority
6  you talked about?
7         MR. PEREZ:  Form.
8         THE WITNESS:  That's correct.
9  BY MR. ERIKSEN
10    Q   And does that article go on to say, quote,
11 researchers haven't determined why some people who have
12 had concussions develop persistent post-concussion
13 symptoms while others do not and there's no proven
14 connection between the severity of the injury and the
15 likelihood of developing persistent post-concussion
16 symptoms, end quote?
17    A   That's correct.
18    Q   All right.  So on this first causation step
19 of what we said was general --
20    A   Biological plausibility.
21    Q   -- or biological plausibility, I'm going to
22 hand you another journal that I'm going to mark as
23 Plaintiff's Exhibit 6.
24        (Whereupon, Plaintiff's Exhibit No. 6
25        was marked for identification.)

Page 124

1  BY MR. ERIKSEN
2     Q   And I don't want to give you the one that
3  I've marked up.  Just take a minute to look at that.
4  Is that a --
5     A   Out of the Journal of Neurotrauma.
6     Q   Right.  Is that a 2016 article in that
7  journal?
8     A   No, I think it's April 15, 2017.
9     Q   You're right.  And so are you familiar with
10 the Journal of Neurotrauma?
11    A   Yes.
12    Q   Is that a respected and peer-reviewed journal
13 that deals in the field of neurotrauma?
14    A   Yes.
15    Q   Is a concussion a form of neurotrauma?
16    A   Yes.
17    Q   When you took your board certification exam
18 to become board certified in brain injury medicine, did
19 you have to study that journal?
20    A   Yes.
21    Q   You know, I didn't complete your
22 qualifications as they may relate to neurological
23 rehabilitation, but in addition to being board
24 certified in that area, have you also been a medical
25 director for a neurological rehabilitation unit or

31 (Pages 121 to 124)

Page 125

1  institution here in the State of Florida?
2      A.  Yes.  I still am.  I'm the medical director
3  of the Florida Institute for Neurologic Rehab which is
4  a 136-bed transitional living facility, also New Life
5  which is a 52-bed transitional living facility for
6  patients that have suffered from traumatic brain injury
7  and spinal cord injury.  These patients are not bad
8  enough to be in the hospital but they're not good
9  enough to be home and independent.  So this is
10  transitional living, and I've been involved -- that's
11  called post-acute rehab.  I've been doing that for over
12  25 years.
13      Q.  So let's go back to this Plaintiff's Exhibit
14  6.  We established that it is a 2017 study published
15  in the Journal of Neurotrauma.  Is the title of that
16  study, quote, Longitudinal Study of Post-Concussion
17  Syndrome Not Everyone Recovers, end quote?
18      A.  Yes.  That's correct.
19      Q.  And the lead author of that is Carmen
20  Hiploylee; is that correct?
21      A.  Yes.
22      Q.  And she is indicated as being a member of the
23  division of neurosurgery and the division of neurology
24  at The University of Toronto in Canada?
25      A.  That's correct.

Page 126

1      Q.  Let's just take a look at the abstract and
2  maybe we can get through what this article or this
3  study did and what the conclusion was.  In that study
4  or in that article, did they indicate that they
5  examined recovery from post-concussion syndrome in a
6  series of 285 patients diagnosed with concussion?
7      A.  Yes.
8      Q.  And did they find in that study that only 27
9  percent of their population eventually recovered and
10  67 percent of those who recovered did so within the
11  first year?
12      A.  That's correct.
13      Q.  Did they also find that permanent or
14  post-concussion syndrome may be permanent if recovery
15  has not occurred by three years?
16      A.  That's correct.
17      Q.  And did they also determine that symptoms
18  appear in a predictable order and each additional
19  post-concussion syndrome symptom reduces the recovery
20  rate by 20 percent?
21      A.  That's correct.
22      Q.  And in that article on the first page under
23  introduction, do they state there that post-concussion
24  syndrome encompasses a constellation of symptoms that
25  commonly include headache, depression, difficulty

Page 127

1  concentrating and fatigue?
2      A.  Yes.
3      Q.  And in Ms. Fylling's case, did she have all
4  of those things with an abrupt onset after this head
5  impact that she sustained on the ship?
6      MR. PEREZ:  Form.
7      THE WITNESS:  She did.
8  BY MR. ERIKSEN:
9      Q.  And is the chronic headache, is that by far
10  the most common symptom of persistent post-concussion
11  syndrome?
12      A.  Yes.
13      Q.  In that particular study, did they find a --
14  quote, a strong association between the total number of
15  symptoms present and the time to recover, end quote?
16      A.  Yes.
17      Q.  Did they also determine that, and I'm just
18  quoting from the last page of the article, quote, an
19  important finding in our study was that no patient
20  recovered who had post-concussion syndrome lasting
21  three years or longer, end quote?
22      A.  That's correct.
23      Q.  So does that article and that study establish
24  the concept of a permanent persistent post-concussion
25  syndrome following a mild head injury?

Page 128

1      A.  That is correct.
2      Q.  Okay.  Let's take a look at another study,
3  and I actually think this is included in both the
4  Hiploylee study from Canada, and the next article that
5  I'm going to mark as Plaintiff's Exhibit 7.
6      (Whereupon, Plaintiff's Exhibit No. 7
7      was marked for identification.)
8      (Whereupon, a brief recess was
9      taken.)
10  BY MR. ERIKSEN:
11      Q.  Okay.  I'm going to hand you Exhibit 7.  I
12  got a copy for counsel here I think somewhere.  I'll
13  tell you -- for some reason I only have two copies.
14      A.  I have a copy in my book.  It's in my -- he
15  can hold it.  I've got a copy right here.
16      Q.  Okay.  Is that a recent study that was --
17      A.  I got to take this.
18      (Brief interruption.)
19      THE WITNESS:  Go ahead, Mike.
20  January 31, 2018.
21  BY MR. ERIKSEN:
22      Q.  Is that a study conducted in or published in
23  2018 by some scientific investigators in New Zealand
24  entitled, quote, Population Based Cohort Study of the
25  Impacts of Mild Traumatic Brain Injury in Adults Four

32 (Pages 125 to 128)

Page 129

1   Years Post Injury, end quote?
2       A   It is.
3       Q   Is the lead author on that article Alice
4   Theadon, T-H-E-A-D-O-N?
5       A   Yes.
6       Q   And do they state in the abstract that,
7   quote, the purpose of this study is to determine if
8   there are long-term effects of mild traumatic brain
9   injury four years later, end quote?
10      A   Yes.
11      Q   And do they state in the introduction on the
12  second page that, quote, while there is considerable
13  variation in how traumatic brain injury affects a
14  person and their level of function, people commonly
15  experience a range of impairments referred to as
16  post-concussion symptoms.  These include cognitive;
17  example, difficulty concentrating and taking longer to
18  think.  Somatic; examples, headache, fatigue or
19  dizziness.  And emotional symptoms; examples, feeling
20  irritable, frustrated or restless.  And cognitive
21  symptoms have been linked to reduced productivity at
22  work, end quote?
23      A   That's correct.
24      Q   And so, again, did Ms. Fylling have a history
25  of all those things beginning abruptly after the

Page 130

1   incident on the cruise ship?
2       MR. PEREZ:  Form.
3       THE WITNESS:  Yes.
4   BY MR. ERIKSEN:
5       Q   And part of your job as a rehabilitation
6   specialist, is that to get some patient with a given
7   injury or condition and a range of signs and symptoms
8   back into productivity?
9       A   Correct.
10      Q   Is that what you do?
11      A   We try to maximize a patient's function to
12  reintegrate them back into society at their highest
13  functioning level as safe as we can.  That is the goal
14  of rehabilitation medicine.
15      Q   Now, I think you told us earlier in the
16  deposition that Ms. Fylling as of the time she went on
17  the cruise but before she got injured was a high level
18  thinker who was involved in the biotech industry as an
19  executive and as a researcher?
20      A   That's correct.
21      Q   I don't want to demean floor nurses but is
22  that level of medical functioning that she was at a
23  little higher than what you might expect from a typical
24  nurse at a hospital?
25      MR. PEREZ:  Form.

Page 131

1       THE WITNESS:  No, it's a lot higher.
2   BY MR. ERIKSEN:
3       Q   Okay.  So if we fast forward, did she have
4   any difficulties performing work at that level prior to
5   the incident on the cruise ship?
6       A   No.
7       Q   Did she seem to have a fairly long-term
8   history of being employed in that industry?
9       A   Yes.
10      Q   Now, when you examined her and looked through
11  her medical records and took a history from her, is
12  part of what you saw in there some neuropsychological
13  testing that had been done by Dr. Pollard?
14      A   Yes.
15      Q   Based on all of that, were you able to
16  conclude that the major things that have kept her from
17  reentering her field at all, let alone the level that
18  she was at, chronic headaches and chronic cognitive
19  dysfunction?
20      A   That's correct.
21      Q   Okay.  Just going back to this study that we
22  were talking about, which is Exhibit 7, do the authors
23  in that discussion section state, quote, the
24  persistence of cognitive symptoms four years post
25  injury suggest that cognitive symptoms which fail to

Page 132

1   resolve in the acute phase post injury are likely to
2   become chronic and impact participation without
3   intervention?
4       A   That is correct.
5       Q   Do they also say, quote, people experiencing
6   acute cognitive symptoms -- well, forget that part.
7       Do they there also state, quote, people
8   experiencing acute cognitive symptoms who have a
9   history of traumatic brain injury, sought acute medical
10  attention, experience poor sleep quality and with high
11  levels of anxiety or depression are more at risk of
12  persistent long-term cognitive symptoms, end quote?
13      A   That's correct.
14      Q   Is that consistent with your own clinical
15  experience?
16      A   Yes.
17      Q   So, in the discussion section on Page 9, do
18  they state, quote, the significant differences observed
19  in their study between the mild traumatic brain injury
20  cohort four years post injury and controls, while
21  small, were notable and given that it has been
22  previously perceived that most cases of mild traumatic
23  brain injury resolve in the days to weeks following the
24  injury, end quote?
25      A   That's correct.

Page 133

1      Q   Does this study then go against established
2   facts that go against the conventional wisdom that mild
3   traumatic brain injury and post-concussion syndrome
4   typically resolve in a short amount of time?
5          MR. PEREZ:  Form.
6          THE WITNESS:  That's correct.  It goes
7      against it, but it's consistent with the
8      literature that I've described in my
9      evaluation under Tab No. 4, a mild traumatic
10     brain injury, the miserable minority.  I have
11     15 peer-reviewed, published articles in there
12     talking about the mild traumatic brain injury,
13     and here's the bottom line to all of this, and
14     this is what you need to know to pass your
15     boards.
16        85 percent of mild traumatic brain injury
17     resolved within three months.  15 percent
18     don't resolve in three months, and the
19     15 percent that don't resolve in three months
20     can last a lifetime.  They're permanent in
21     nature.
22   BY MR. ERIKSEN
23     Q   Do those two studies that we just discussed,
24   which is Plaintiff's Exhibit 6 and 7, they were done
25   within the last couple of years, provide definitive

Page 134

1   support for what you just said?
2          MR. PEREZ:  Form.
3          THE WITNESS:  Yes, and the idea of the
4      miserable minority is not something that I
5      came up with.  The miserable minority is in
6      the literature, and this describes the
7      patients that suffer from mild traumatic brain
8      injury that don't resolve and, in fact, it's
9      permanent in nature.
10   BY MR. ERIKSEN
11     Q   In general, do elderly victims of mild
12   traumatic brain injury or concussion, are they at a
13   risk of a worse outcome than a person who is younger?
14     A   They are.
15     Q   And can you generally explain why?
16     A   All I can tell you is the very, very young
17   and the very, very old do not fair well with traumatic
18   brain injury.
19     Q   And I'm going to show you an article that I'm
20   going to mark as Exhibit 8, Plaintiff's Exhibit 8.
21          (Whereupon, Plaintiff's Exhibit No. 8
22          was marked for identification.)
23   BY MR. ERIKSEN
24     Q   That appeared in the Journal of Trauma in
25   February -- or in 2002, not February, with a primary

Page 135

1   author being Mark Susman but others including several
2   medical doctors entitled, quote, Traumatic Brain Injury
3   in the Elderly Increased Mortality and Worse Functional
4   Outcome at Discharge Despite Lower Injury Severity.
5          Do those authors there state in their
6   conclusion in the abstract, elderly traumatic brain
7   injury patients have a worse mortality and functional
8   outcome than non-elderly patients who present with head
9   injury even though their head injury and overall
10  injuries were seemingly less severe?
11     A   That is correct.
12     Q   Is this -- the Journal of Trauma, is that a
13  peer-reviewed journal?
14     A   Yes.
15     Q   And does that finding in that study support
16  the concept that you just raised of elderly patients
17  having a worse outcome than younger patients from a
18  mild traumatic brain injury or concussion, all other
19  things being equal?
20          MR. PEREZ:  Form.
21          THE WITNESS:  That is correct.
22          (Whereupon, a brief discussion was
23          held off the record.)
24   BY MR. ERIKSEN
25     Q   Okay.  Continuing on this topic of elderly

Page 136

1   victims of mild traumatic brain injury versus younger
2   ones and the effective age on outcome, I'm going to
3   mark another article as Plaintiff's Exhibit 9.
4          (Whereupon, Plaintiff's Exhibit No. 9
5          was marked for identification.)
6   BY MR. ERIKSEN
7      Q   I'll hand it to you, a copy to counsel.  All
8   right.  So is that a 2017 article in the Journal of
9   Neurotrauma entitled, quote, Geriatric Traumatic Brain
10  Injury Epidemiology:  Outcomes, Knowledge Gaps, and
11  Future Directions, end quote?
12     A   Yes.
13     Q   And is the lead author on that article Raquel
14  Gardner?
15     A   Yes.
16     Q   And is she listed as being a member of the
17  department of neurology at The University of California
18  San Francisco and San Francisco VA Medical Center?
19     A   Yes.
20     Q   And is she also a member of the University of
21  California San Francisco Weill Institute for
22  Neurosciences?
23     A   Yes.
24     Q   And did she and her coauthors of this article
25  conduct a review of the literature on traumatic brain

Page 137

1  injury in older adults focusing on traumatic brain
2  injury sustained in older adulthood or geriatric TBI?
3      A   That is correct.
4      Q   And did that study determine that there
5  was -- at least the literature established a higher
6  morbidity and mortality rate among older versus younger
7  individuals with TBI?
8      A   Correct.
9      Q   And what does morbidity mean?
10     A   Increased pain and mortality increase death.
11     Q   Do they state in their introduction, quote,
12 unsurprisingly older adults with TBI experience higher
13 morbidity and mortality and slower recovery
14 trajectories and have on average worse functional
15 cognitive and psychosocial outcomes months or years
16 post injury than do younger patients, end quote?
17     A   Yes.
18     Q   Do they state on Page 892 under the topic of
19 neuroimaging -- before I get to neuroimaging.  Is
20 there -- under the section entitled, clinical
21 assessment on Page 892, do they there state that,
22 quote, the Glasgow Coma Scale, although the most widely
23 used clinical assessment to determine traumatic brain
24 injury severity at the time of initial presentation may
25 lack the nuance required to accurately assign TBI

Page 138

1  severity in older adults, end quote?
2      A   That's correct.
3      Q   And then do they go down, under neuroimaging
4  section do they say, quote, even those with normal GCS
5  which is 15 are at a high risk, 17 percent of adults
6  greater than 60 years of age with a normal GCS had a
7  positive head CT in one large Canadian study?
8      A   Correct.
9      Q   So let's just talk about Glasgow Coma Scale.
10 Can a person be having a stroke and have a normal
11 Glasgow Coma Scale?
12     A   Yes.
13     Q   Why is that?  How can that be?
14     A   Because you can have a stroke and still be
15 conscious initially.
16     Q   So what is Glasgow Coma Scale?
17     A   Glasgow Coma Scale has to do with traumatic
18 brain injury and level of consciousness.
19     Q   Is it a simple test that a paramedic can
20 conduct?
21     A   Well, that's what it is.  It's eyes, verbal
22 and motor.  Fifteen is normal, below 8 is you're
23 unconscious.
24     Q   Okay.  You mentioned that imaging techniques
25 have limitations in terms of their ability to see a

Page 139

1  concussion?
2      A   There are limitations to all imaging.  For
3  instance, you could be dead and have a normal MRI of
4  your brain, okay, initially.  The greater majority,
5  probably greater than 99.5 percent of CT scans, MRI
6  scans with a concussion is going to be normal.  I think
7  that the statistic is .3 percent may be abnormal in a
8  mild traumatic brain injury.
9      Q   Is that high percentage of normal CTs and
10 MRIs in a concussed patient in any way inconsistent
11 with a concussed patient developing persistent
12 permanent post-concussion syndrome?
13         MR. PEREZ:  Form.
14         THE WITNESS:  No, it is not.  You can
15     have a normal Glasgow Coma Scale, normal MRI,
16     normal CT scan and still have -- become part
17     of the miserable minority.
18 BY MR. ERIKSEN
19     Q   How can that possibly be?
20     A   It just is.  I don't have any explanation.
21 It just is.  In fact, if you look at tab number -- in
22 my report, Tab No. 7, I have traumatic brain injury, a
23 disease process.  They talk about traumatic brain
24 injury as a chronic health condition.  Traumatic brain
25 injury, a disease process, this was in the Journal of

Page 140

1  Neurotrauma.  I have 22 peer-reviewed articles talking
2  about one insult to the brain can cause an ongoing
3  problem through life.
4          Now we know through peer-reviewed literature
5  and science that you don't have to have multiple hits
6  to the head to have an ongoing process from brain
7  injury.  You can have one hit to the head and develop a
8  significant brain injury over time.
9      Q   Including one that can't be visualized on an
10 image?
11     A   That's correct because you could be part of
12 the miserable minority.  The miserable minority usually
13 doesn't have anything on an image, they may not lose
14 consciousness, but their symptoms don't resolve after
15 three months.  85 percent of people's symptoms in the
16 mild traumatic brain injury resolve after three months.
17 The 15 percent that don't is known as the miserable
18 minority.  That's in the literature.  That's not a
19 Craig Lichtblau term.  That is a peer-reviewed,
20 published term that is in the brain injury medicine
21 peer-reviewed literature.
22     Q   How long have you been a physiatrist?
23     A   Well, I was in training in 1985.  I graduated
24 in 1989.  This September 22nd I will be in practice
25 30 years.

Page 141

1  Q  From then until now, how many times would you
2  estimate you have dealt -- encountered patients who
3  sustained a mild traumatic brain injury and/or a
4  concussion that's not visible on any kind of a scan but
5  that nevertheless turned into a member of this
6  miserable minority you're talking about?
7  A  Well, it's not a lot, but it does happen.
8  Q  Okay.  Is it uncommon?
9  A  No.
10  Q  Have you seen it?
11  A  I've definitely seen it in my practice.
12  Q  And does a rehabilitation specialist tend to
13  deal with patients on a long-term basis?
14  A  Yes, because we have patients that manage
15  long-term disability.  A lot of internists and
16  neurosurgeons, you know, they don't want to deal with
17  that so they send them to a physiatrist.
18  Q  What are we up to now?  What was that last
19  article that I gave you?
20  A  Nine.
21  Q  Okay.  I'm going to mark another journal as
22  Exhibit 10.
23       (Whereupon, Plaintiff's Exhibit
24       No. 10 was marked for identification.)
25

Page 142

1       MR. ERIKSEN:  I'll hand it to you.  I'll
2  hand a copy to counsel.
3       (Whereupon, a brief discussion was
4       held off the record.)
5  BY MR. ERIKSEN
6  Q  Here's a copy for counsel.
7  Is that an article published in 2015 in the
8  Journal of Neurotrauma that we already talked about?
9  A  Yes.
10  Q  Is the title of the article, quote,
11  Systematic Review of Multivariable Prognostic Models
12  for Mild Traumatic Brain Injury, end quote?
13  A  Yes.
14  Q  Is the lead researcher Noah Silverberg who is
15  at the University of British Columbia in Strong Rehab
16  Centre in Vancouver?
17  A  Yes.
18  Q  And does that study in the abstract down at
19  the bottom conclude --
20  A  You're leaving out something.  Department of
21  Physical Medicine and Rehabilitation, Harvard Medical
22  School, Spaulding Rehabilitation Hospital,
23  Massachusetts General Hospital, Sport Concussion Clinic
24  and Red Sox Foundation in Massachusetts General
25  Hospital.  Home based program, Charlestown,

Page 143

1  Massachusetts.  So Harvard is involved in this.
2  Q  Do they state that the present study aimed,
3  one, to identify and evaluate multivariable prognostic
4  models for mild traumatic brain injury, and two, to
5  determine which pre-, pari- and early post-injury
6  variables have independent prognostic value in the
7  context of models?
8  A  Yes.
9  Q  Basically is the idea there to take these
10  different things like Glasgow Coma Scale, loss of
11  consciousness or not and sex, age, and other factors to
12  determine if they're present, do they predict poor
13  recovery from a mild traumatic brain injury?
14       MR. PEREZ:  Form.
15       THE WITNESS:  That is correct.
16  BY MR. ERIKSEN
17  Q  Did they conclude that, quote, the severity
18  of the mild traumatic brain injury had little long-term
19  prognostic value, end quote?
20  A  That is correct.
21  Q  Let's take a look at another article.  I'm
22  going to mark it as Exhibit 11.
23       (Whereupon, Plaintiff's Exhibit
24       No. 11 was marked for identification.)
25

Page 144

1  BY MR. ERIKSEN
2  Q  Is that a journal that appeared in the
3  Journal of Neurosurgery in 2016 entitled, quote, Post
4  Concussion Syndrome:  Demographics and Predictors in
5  221 Patients?
6  A  Yes.
7  Q  And is the lead author in that article
8  Charles Tator, who with the other authors is associated
9  with the Canadian Concussion Center in Toronto?
10  A  Yes.
11  Q  Did 23 percent of the concussion studies in
12  their paper involve only one concussion?
13  A  That is correct.  A median duration of
14  post-concussion syndrome was seven months with a range
15  all the way up to 26 years.
16  Q  In their introduction, do they state most
17  individuals recover from a concussion within seven to
18  ten days but some do not recover for months or years
19  after the injury and some never recover, end quote?
20  A  That's correct, and that's consistent with my
21  opinions and it's been consistent with the
22  peer-reviewed literature that I've already described
23  and put on the record.
24  Q  Okay.  Is the Journal of Neurosurgeon a
25  peer-reviewed journal?

36 (Pages 141 to 144)

Page 145

1        A   Yes.
2        Q   For all the neurosurgeons out there in the
3   world that are M.D.s, is that the board that certifies
4   them?
5        A   Yes.
6        Q   Do they go on to conclude in their discussion
7   on Page 1214 that, quote, as observed in other studies,
8   the most common symptom of post-concussion syndrome in
9   the present study was headache, end quote?
10       A   That's correct, and that's what's known in
11  the literature and that's what's on the boards.
12       Q   Do they state near the end of their
13  discussion, quote, another interesting finding is that
14  the number of symptoms was the sole significant
15  predictor for the duration of post-concussion syndrome.
16  For each additional symptom experienced, the recovery
17  rate is reduced by 25 percent, which is indeed a major
18  factor, end quote?
19       A   Correct.
20       Q   Did Ms. Fylling have multiple symptoms of
21  post-concussion syndrome?
22       A   She did.
23       Q   Okay.  One of the things that you rendered in
24  this case was a rebuttal report to the opinion of
25  Dr. Dannenbaum.

Page 146

1        A   Yes.
2        Q   I want to make sure that -- does that
3   rebuttal report -- I think it's one of the defense
4   exhibits.  I want to make it a plaintiff exhibit.  I'm
5   going to mark your rebuttal record as Exhibit 12.
6           (Whereupon, Plaintiff's Exhibit
7        No. 12 was marked for identification.)
8   BY MR. ERIKSEN
9        Q   And it appears if we look at the bottom of
10  page -- actually, if you look at the beginning of it
11  under paragraph one on Page 1, it looks like you start
12  to cite literature all the way through the report.  I'm
13  not going to ask you to talk about specific findings in
14  the literature, but I want to make sure he walks away
15  with it.
16          So the first article that you cite under
17  paragraph or section one is an article by Borden, that
18  says -- it's entitled a proposed classification for
19  spinal and cranial dural arteriovenous fistulas,
20  malformations, and implications for treatment in the
21  journal of neurosurgery.  Do you see that?
22       A   Yes.
23          MR. ERIKSEN:  Okay.  I'm going to mark
24       that journal as Plaintiff's Exhibit 13.
25          (Whereupon, Plaintiff's Exhibit

Page 147

1        No. 13 was marked for identification.)
2   BY MR. ERIKSEN
3        Q   And just ask you to look at it and verify
4   that that's the same journal that you referenced in
5   your report.
6        A   It is.  That's No. 13.
7        Q   By the way, did -- was the dural
8   arteriovenous fistula that Ms. Fylling was found to
9   have a Borden Type III fistula?
10       A   Yes.
11       Q   Is that the Borden, the author?
12       A   Yes.
13       Q   Okay.  Does he say on Page 177 of his
14  article, which is Exhibit 13, quote, it is easy to see
15  how trauma can lead to fistula formation between
16  meningeal arteries and veins or dural sinuses, end
17  quote?
18       A   He does.
19       Q   So --
20       A   Page 177, that is in the peer-reviewed
21  literature which, of course, is inconsistent with
22  Dr. Dannenbaum's opinion.
23       Q   Okay.
24          MR. PEREZ:  Move to strike that.
25

Page 148

1   BY MR. ERIKSEN
2        Q   Okay.  So the second -- Paragraph No. 2 of
3   your rebuttal report, you cite -- you basically make
4   the statement, Tinnitus caused by a fistula is
5   typically pulsatile and unilateral.  And then you cite
6   an article by An, A-N, entitled, quote, Dural
7   Arteriovenous Fistula Masquerading as Pulsatile
8   Tinnitus, et cetera, in the scientific report journal
9   2016; is that correct?
10       A   Correct.
11       Q   Okay.  I'm going to mark what purports to be
12  that journal as Exhibit 14.  Plaintiff's Exhibit 14.
13          (Whereupon, Plaintiff's Exhibit
14       No. 14 was marked for identification.)
15  BY MR. ERIKSEN
16       Q   Can you just look at that and verify that
17  that is the article referenced in that part of your
18  rebuttal report?
19       A   It is.
20       Q   Okay.  So let's see how we're doing.  The
21  next final paragraph of -- or section 3 of your
22  rebuttal report, most of which is on Page 2, lists a
23  number of journals.  Before we inventory those
24  journals, can you just look at your section 3 of your
25  rebuttal report on the first page?

1      A   Yes.
2      Q   Just read that out loud down to -- and stop
3   where you get to the first journal.
4      A   One absolutely does not have to lose
5   consciousness, have a reduced Glasgow Coma Scale or
6   have positive imaging to get a serious concussion with
7   persistent headaches, cognitive dysfunction, blurred
8   symptoms, persistent, also known as persistent
9   post-concussive syndrome, or be increased risk of
10   developing the later other delayed neurological
11   consequences such as dementia or Parkinson's Disease,
12   particularly in the elderly patient such as
13   Ms. Fylling.
14      Several recent studies have demonstrated that
15   a concussion without loss of consciousness and/or
16   reduction in Glasgow Coma Scale can nevertheless cause
17   persistent permanent post-concussive syndrome with the
18   most common symptoms being chronic headache and
19   cognitive dysfunction.
20      Q   Okay.  So can I have my stack of articles
21   back?
22      (Whereupon, a brief discussion was
23      held off the record.)
24   BY MR. ERIKSEN
25      Q   Let's just go through the journals that

1   you've inventoried in section 3 of your rebuttal report
2   just to make sure I've got them all marked and attached
3   to the deposition.  Looks like the Hiploylee article,
4   that's Plaintiff's Exhibit 6.  The Theadom article,
5   that's Plaintiffs Exhibit 7.  The next one that's cited
6   is Defrin, Deficient Pain Modulatory Symptoms in
7   Patients With Mild Traumatic Brain Injury and Chronic
8   Post-Traumatic Headache, end quote, in the Journal of
9   Neurotrauma. I don't think we've marked that one. Let
10   me do that now.  I'll make that exhibit -- what's your
11   number?
12      MR. ERIKSEN:  I'm going to mark the
13   Defrin article as Exhibit 15.
14      (Whereupon, Plaintiff's Exhibit
15      No. 15 was marked for identification.)
16   BY MR. ERIKSEN
17      Q   Can you just verify that that's the Defrin
18   article referenced in your rebuttal report?
19      A   It is.  So that's Exhibit 15.
20      Q   So the next article referenced in that
21   section of your rebuttal report is the Gardner article?
22      A   Yes.
23      Q   And so that is Exhibit 9.  It is Exhibit 9,
24   Plaintiff's Exhibit 9.
25      The next one is the Mayo Clinic publication

1   on post-concussion syndrome?
2      A   Yes.
3      Q   And that is Exhibit 5.
4      The next one is an article by McMahon
5   entitled, Symptomatology and Functional Outcome in Mild
6   Traumatic Brain Injury from the TRACK-TBI Study Journal
7   of Neurotrauma in 2014.  We'll mark it as 16.
8      (Whereupon, Plaintiff's Exhibit
9      No. 16 was marked for identification.)
10   BY MR. ERIKSEN
11      Q   We marked that article correctly as
12   Plaintiff's Exhibit 16?
13      A   Yes, that is correct.
14      Q   I'm handing a copy of that to counsel.
15      Okay.  The next article listed there is a
16   Rabinowitz article, and I think we marked that as --
17   we'll mark that as Exhibit 17, Plaintiff's Exhibit 17.
18      (Whereupon, Plaintiff's Exhibit
19      No. 17 was marked for identification.)
20      MR. PEREZ:  Yeah, that's correct.
21   BY MR. ERIKSEN
22      Q   Is that the article?
23      A   Yes.
24      Q   Now, in that journal, is that another study,
25   an effort published in 2015 in the Journal of

1   Neurotrauma to try to figure out what factors or
2   symptoms would predict the poor recovery from mild
3   traumatic brain injury?
4      A   That's correct.  That includes the Department
5   of Neurosurgery University of Pennsylvania, Physical
6   Medicine and Rehabilitation, Alliance Baylor College of
7   Medicine, Department of Neurology, Baylor College of
8   Medicine, DeBakey Veterans Affairs, Houston, Texas,
9   Department of Emergency Room Medicine, University of
10   Texas Health Science Center.  Rabinowitz was the
11   author.
12      Q   And in the abstract do they state and
13   determine that, quote, at least in their study, quote,
14   older age at injury, female sex, and acute symptom
15   report were predictors of poor symptomatic outcome in
16   three months, end quote?
17      A   That's correct.
18      Q   And on Page 8 of the article, do they state,
19   quote, of note loss of consciousness in post traumatic
20   amnesia were not significant predictors, end quote?
21      A   That's correct.
22      Q   Okay.  The Silverberg article is the next one
23   that you referenced, and that is Plaintiff's
24   Exhibit 10.  And then there's an article by Tator
25   entitled, Post-Concussion Syndrome:  Demographics and

Page 153

1  Predictors in 221 patients in the Journal of
2  Neurosurgery from 2016?
3      A   Correct.
4      Q   And what are we up to, 17?  We'll call this
5  18. I'm sorry, it's already marked.  That Tator
6  article is Plaintiff's Exhibit 11.
7          So is every article that you cited in your
8  rebuttal opinion of Dr. Dannenbaum now attached as an
9  exhibit to this deposition?
10     A   Yes, and all my opinions are backed by
11  peer-reviewed, published literature that is university
12  based.
13     Q   Let's talk about the second component of the
14  causation methodology that you applied to this case and
15  that being temporal association.
16         What does that entail?
17     A   Timing.
18     Q   Okay.  Now, when you reviewed the medical
19  records, did you review in addition to records from the
20  time of this incident on the cruise ship forward,
21  records from the time of the incident on the cruise
22  ship back in time?
23     A   I did.
24     Q   I mean, basically did you review hundreds of
25  pages of medical records from her primary care

Page 154

1  physicians going back years before this incident?
2      A   I did.
3      Q   And I think you -- in the direct examination,
4  you were asked about other specific records of people
5  that evaluated her for vertigo and --
6      A   Headaches.
7      Q   Yes.
8      A   She did not have headaches prior to subject
9  incident.  She had headaches after subject incident.
10     Q   Right.  But I mean, basically if somebody has
11  got chronic headaches, wouldn't you expect them to
12  check in with a doctor once or twice to get relief and,
13  if so, did she ever appear to have gone into a doctor
14  in any of the records from before this incident and
15  complain of a headache?
16         MR. PEREZ:  Form.
17         THE WITNESS:  Not that I'm aware of.
18  BY MR. ERIKSEN
19     Q   Okay.  Same question as to cognitive
20  dysfunction.  Did she ever go into doctors complaining
21  of having trouble thinking straight, I'm having trouble
22  with mental processing speed or anything like that?
23     A   Not that I'm aware of.
24     Q   Before the cruise incident?
25     A   Not that I'm aware of.

Page 155

1      Q   However, once the cruise incident happened,
2  were there immediate complaints of both of those
3  symptoms on a chronic basis and repeated basis?
4          MR. PEREZ:  Form.
5          THE WITNESS:  Yes.
6  BY MR. ERIKSEN
7      Q   And you mentioned I think that one of the
8  factors that you take a look at was about a couple of
9  months after being treated immediately following the
10  cruise ship for those symptoms and others, she then is
11  referred up to Morton Plant Hospital for diagnostic
12  angiogram?
13     A   That's correct.
14     Q   And from your review of the record, was the
15  reason that she was sent up there was that she's having
16  these chronic headaches and cognitive symptoms and
17  blurry vision in her right eye and the scans were all
18  coming back normal so they wanted to do a further
19  evaluation?
20     A   Correct.
21     Q   And was that what was going on when this
22  attempted embolization of this fistula that was seen up
23  there was unsuccessful and there was a small nick of a
24  vein?
25     A   Correct.

Page 156

1      Q   So before the vein was nicked at Morton Plant
2  in early May of 2017 and before there was a fistula
3  that was seen up there for the first time on an
4  angiogram, did she have chronic and severe headaches
5  and chronic, severe dysfunction in her ability to
6  think?
7          MR. PEREZ:  Form.
8          THE WITNESS:  No.
9  BY MR. ERIKSEN
10     Q   Before the -- I'm talking about after the
11  cruise ship incident, before she ever went to Morton
12  Plant, in that inclusive period of time, was she having
13  chronic headaches right after the cruise ship incident
14  and difficulty in thinking?
15     A   Yes, that's correct.  She was.  The previous
16  answer, I misunderstood the question.  And that was the
17  basis of my testimony.  I stated that after subject
18  incident she had headaches and an inability to think
19  straight, and she lost cognitive capacity after subject
20  incident, and that remained the same throughout.
21     Q   Okay.  So she goes to Morton Plant and she
22  has this little nick of a vein that results in a small
23  hemorrhage and she spends a period of time in a rehab
24  facility where she's got word finding difficulties and
25  she's having trouble standing.  But once she gets done

Page 157

1  with that, she returns to her baseline before she went
2  to Morton Plant, of which were the chronic headaches
3  and the chronic and severe difficulties in thinking, is
4  that what happened?
5      MR. PEREZ:  Form.
6      THE WITNESS:  That's correct, but just so
7  there's no misleading testimony to her chronic
8  baseline of headaches and difficulty thinking
9  that she sustained after the cruise ship
10  accident.  She didn't have it prior to subject
11  incident.
12 BY MR. ERIKSEN
13     Q   Right, but she had severe -- did you read
14 where Dr. Dakouny was -- her headaches were so bad
15 after the cruise ship incident, he was giving her
16 hydrocodone?
17     A   That's correct, which is a narcotic.
18     Q   Right.  And the level of chronic headaches
19 and the level of cognitive dysfunction that she was
20 having right after the cruise incident but before she
21 went to Morton Plant in early May that resulted in that
22 small hemorrhage, is that what she's experiencing right
23 now?
24     A   Correct.
25     Q   Okay.

Page 158

1      A   I think we got it all on the record.
2      Q   Well, we got to go to the last element of
3  causation, which is the other plausible explanations,
4  which --
5      A   Let's try to get this done.
6      Q   Which I think you've kind of discussed.  Do
7  you discuss that topic both in your main report and
8  also in the rebuttal report?
9      A   I do, and it's confirmed by the treating
10 neurosurgeon.
11     Q   Okay.  Well, irrespective of what the
12 treating neurosurgeon has to say on the same topic and
13 irrespective of what any -- are you capable of arriving
14 at your own conclusions on that topic?
15     A   I am.
16     Q   And did you do so?
17     A   I did.
18     Q   Okay.  Did they happen to be confirmed by the
19 treating neurosurgeon when you spoke to him?
20     A   That's correct.
21     Q   Have you reviewed his report in this case?
22     A   I did.
23     Q   Let's make sure we got that attached as an
24 exhibit.  I'm going to mark, I think we're up
25 to exhibit --

Page 159

1      THE REPORTER:  The last one was 17.
2      MR. ERIKSEN:  I'm going to mark another
3  document as Plaintiff's Exhibit 18.
4      (Whereupon, Plaintiff's Exhibit
5      No. 18 was marked for identification.)
6  BY MR. ERIKSEN
7      Q   Can you just look at that and tell us what
8  that is.  Is that a copy of the report from the
9  treating neurosurgeon --
10     A   It is.
11     Q   -- that you looked at?
12         What's the date on it?
13     A   That would be December 14, 2018.
14     Q   So I'm going to take a look at your --
15     A   All right.  I've got to use the restroom.
16         (Whereupon, a brief recess was
17     taken.)
18 BY MR. ERIKSEN
19     Q   In your summary report on Pages 7 and 8 and
20 in your rebuttal report which is Plaintiff's
21 Exhibit 12, do you go through the consideration that
22 you gave to other alternative explanations for her
23 current chronic severe headaches and current chronic
24 severe cognitive dysfunction that is keeping her now
25 from performing her previous --

Page 160

1      A   I did.
2      Q   -- vocational function?
3      A   I did.  It's stated in the report.  It's
4  stated in the rebuttal.
5      Q   All right.  What other potential causes did
6  you consider?  Let's start with one that was brought in
7  the deposition today.  You were asked a number of
8  questions about medications that she's taken over time
9  that may produce similar symptoms.  Have you taken that
10 into account?
11     A   I have and I doubt it.  I doubt that that's
12 the major contributing cause to her impairment and
13 disability as a direct result of the injuries sustained
14 on subject accident.
15     Q   All right.  So was she taking some of those
16 medications before the incident?
17     A   Yes.
18     Q   Were they producing any cognitive problems or
19 headaches?
20     MR. PEREZ:  Form.
21     THE WITNESS:  No.
22 BY MR. ERIKSEN
23     Q   So does that make it less likely that the
24 chronic headaches, severe headaches and the severe
25 cognitive dysfunction she's had ever since this cruise

Page 161

1  incident were related to medication?
2         MR. PEREZ:  Form.
3         THE WITNESS:  No.
4  BY MR. ERIKSEN
5     Q   Does the fact that she was taking the
6  medications before the incident on the cruise ship and
7  didn't have symptoms make it less likely that her
8  chronic symptoms since the cruise incident are
9  medication related?
10        MR. PEREZ:  Form.
11        THE WITNESS:  That's correct.
12 BY MR. ERIKSEN
13    Q   All right.  So you may have misunderstood my
14 previous question.
15    A   Oh.
16    Q   So that's okay.  But the answer you just gave
17 me is correct; is that right?
18    A   Yes.
19    Q   Okay.  So did you consider the fistula to be
20 a potential cause of the two main symptoms we were just
21 talking about, the headaches and the --
22    A   That's correct.  She had -- she had the
23 symptomatology before the AV malformation, before the
24 meningioma, the two surgical procedures as well as the
25 hemorrhage.  So she had that symptomatology which is

Page 162

1  consistent with the miserable minority which is severe
2  headaches, cloudiness in thinking, prior to all of
3  those things.  And then after that healed and got
4  better, she had the same symptomatology of the
5  headaches and the difficulty thinking straight.  So
6  therefore, I think it's the cruise injury that is the
7  major contributing cause to her problem.
8     Q   If some lawyer were to come to you and
9  present you with a hypothetical case against the Morton
10 Plant Hospital that her current conditions that she has
11 today, which is the chronic headaches, severe headaches
12 and the cognitive dysfunction are somehow related to
13 that, would you have to tell them that all of those
14 symptoms preexisted Morton Plant?
15    A   That's correct.  That would be -- for them to
16 have that theory, they would have no stance because
17 that symptomatology predated the Morton Plant Hospital.
18    Q   Okay.  So have you identified through the
19 methodology we discussed for the last hour, the major
20 conditions that she is today suffering that to a
21 reasonable degree of medical probability were caused by
22 the cruise ship incident?
23        MR. PEREZ:  Form.
24        THE WITNESS:  I have.
25

Page 163

1  BY MR. ERIKSEN
2     Q   Would that include concussion, persistent
3  post-concussion syndrome that is now permanent that
4  includes chronic and permanent traumatic headaches?
5     A   Yes.
6     Q   And chronic and permanent cognitive
7  dysfunction?
8     A   That is correct.
9     Q   And once having identified the conditions
10 that were caused by this incident to a reasonable
11 degree of medical probability, did you then set about
12 to create a future care plan or continuation of care
13 plan for this patient?
14    A   I did.
15    Q   Okay.  Is that what we call the most probable
16 care plan that's in your report?
17    A   The most probable case scenario of the
18 continuation of care.  It's spelled out in the report.
19    Q   Okay.  There's one last topic I wanted to ask
20 you about and we're going to be done.
21        Are you familiar with studies that are recent
22 in nature that show or demonstrate that one who suffers
23 a mild traumatic brain injury, a single event like that
24 and/or a concussion is at an increased risk of
25 developing future delayed neurological consequences

Page 164

1  from.
2         MR. PEREZ:  Form.
3         THE WITNESS:  Yes.
4  BY MR. ERIKSEN
5     Q   Okay.  I'm going to mark an article as
6  Exhibit 19, Plaintiff's Exhibit 19.
7         (Whereupon, Plaintiff's Exhibit
8         No. 19 was marked for identification.)
9  BY MR. ERIKSEN
10    Q   I'm going to hand -- I was going to hand
11 counsel a copy of that.  Let me find that.  I'll let
12 counsel look at it on the way out.  Just take a look at
13 it for a second while I find a couple extra copies, if
14 they exist.
15    A   Yes, this is the Journal of Neurosurgery,
16 February of 2016.
17    Q   I'm handing a copy of that to counsel now.
18 And this is Plaintiff's Exhibit 19.
19        Now, is the lead author on that a doctor
20 named David Perry?
21    A   Yes.
22    Q   Does it appear in the Journal of
23 Neurosurgery?
24    A   Yes.
25    Q   Is that the leading journal in the field of

41 (Pages 161 to 164)

Page 165

1  neurosurgery?
2      A   It is.
3      Q   And does it give us some information on the
4  first page about where the authors come from?
5      A   Yes.
6      Q   The lead author, Dr. Perry, is he associated
7  with the Department of Neurology and Neurosurgery at
8  the University of California San Francisco School of
9  Medicine?
10     A   Yes.
11     Q   Is one of the other coauthors associated with
12 Duke University?
13     A   Yes.
14     Q   Is one of the others associated with the
15 Department of Neurology at the Mayo Clinic?
16     A   Yes.
17     Q   Do they there state that, quote, mild
18 traumatic brain injury, TBI has been proposed as a risk
19 factor for the development of Alzheimer's disease,
20 Parkinson's disease, depression and other illnesses; do
21 they say that?
22     A   Yes.
23     Q   Do they say, quote, the study's objective was
24 to determine the association of prior mild traumatic
25 brain injury with a subsequent diagnosis that is at

Page 166

1  least one year post injury of neurologic or psychiatric
2  disease, end quote; do they say that?
3      A   Yes.
4      Q   Is that what they state as being the purpose
5  of their study?
6      A   Yes.
7      Q   Is this a literature review where the authors
8  go out and pull together a number of journals and
9  articles and reach a conclusion based on that?
10     A   Yes.  This a med analysis and their
11 conclusion was history of TBI including mild TBIs
12 associated with development of neurological and
13 psychiatric illness.  This finding indicates that
14 either TBI is a risk factor for heterogenous
15 pathological process or that TBI may contribute to a
16 common pathological mechanism.
17     Q   So does this article lend support to the
18 concept that a single mild traumatic brain injury such
19 as what Ms. Fylling suffered puts her at an increased
20 risk for the future development of neurological
21 diseases such as dementia and/or Parkinson's disease?
22     A   Yes.
23     Q   Did you take that increased risk into account
24 to a degree when you put together your continuation of
25 care plan for her?

Page 167

1      A   I did.
2      Q   And is that part of the reason why you
3  provided for future aide and attendant care for her?
4          MR. PEREZ:  Form.
5          THE WITNESS:  It is.
6  BY MR. ERIKSEN
7      Q   Explain how you took this type of study or
8  information from a medical journal and combine that
9  with the results of your functional capacity test to
10 get to the recommendation for aide and attendant care.
11     A   As I said earlier, the test is in its
12 entirety.  We look at the whole patient, the history,
13 the physical examination, the mechanism of injury.  The
14 peer-reviewed, published literature I believe backs up
15 my opinion that it's more probable than not that this
16 patient is going to need some aide and attendant care,
17 especially as she ages because as she ages, as she
18 suffers the secondary effects of aging, as everybody
19 will in the courtroom combined with her level of
20 impairment and her level of disability, I believe to
21 keep her safe, she will need a graduated amount of aide
22 and attendant care.  It's not a lot but it's something.
23     Q   When you make a recommendation as you did for
24 aide and attendant care, what is that, by the way?
25     A   That's just somebody to help her.  It's not

Page 168

1  an RN, not an LPN, just a home health aide.
2      Q   Does she -- in addition to the potential for
3  developing things like dementia or Parkinson's disease,
4  in addition to her physical incapacity as measured by
5  your functional capacity test, does other -- do other
6  factors go into the mix such as the fact that her
7  husband just had a stroke?
8          MR. PEREZ:  Form.
9          THE WITNESS:  Well, it does now because
10 that's the facts of the case.
11 BY MR. ERIKSEN
12     Q   When you make recommendations on a
13 continuation of care plan as you did in this case, do
14 you put down the frequency of the care that you're
15 recommending and how much each dose of it costs?
16     A   Yes, it's all spelled out in the continuation
17 of care plan.
18     Q   So when you create the frequency of dosage
19 and the cost per dosage, are you following the standard
20 methodology?
21     A   Yes, it's the peer-reviewed, published
22 literature that I've said three times in this
23 deposition.  It's defined in the American Academy of
24 Physical Medicine and Rehabilitation, February of 2014
25 and, again, in February of 2015, and I follow that

Page 169

1 exact methodology.
2    Q  That's Plaintiff's Exhibit 2; we marked the
3 journal?
4    A  Yes.
5    Q  Okay.  I think that's it.
6    A  I hope so.  Are we done?
7    Q  Anything else you want to tell us?
8    A  No, I think that we've covered this ad
9 nauseam.  We've described all the literature that I've
10 used.  My opinions are based on knowledge, training,
11 clinical practice appearance and over a hundred
12 peer-reviewed, published articles.
13    Q  You know, we've talked before about making --
14 reaching out to some of the different treating
15 physicians in Ms. Fylling's case; is that what you
16 always try to do?
17      MR. PEREZ:  Form.
18      THE WITNESS:  I do that -- I try to do
19    that in every case.
20 BY MR. ERIKSEN
21    Q  Is that part of your standard methodology?
22    A  That is my standard methodology of accuracy
23 at a premium.
24    Q  Why do you do that?
25    A  To have accuracy at a premium, this is a

Page 170

1 legal proceeding.  You're not supposed to speculate,
2 conjecture or aspersions.  I try to do this as accurate
3 as possible which includes knowledge, training,
4 clinical practice experience, peer-reviewed literature
5 and talking to the treating physicians.
6    Q  And on occasion -- I mean, you talked to four
7 or five of her treating physicians?
8    A  Yes.
9    Q  Including the primary treating neurosurgeon?
10    A  Yes.
11    Q  On occasion when you do that, do you
12 sometimes get some of the treating physicians in
13 disagreement in a particular opinion that you might
14 have?
15    A  Absolutely.
16    Q  Now in spite of such a -- what really wasn't
17 much of a disagreement in this case; is that fair to
18 say?
19      MR. PEREZ:  Form.
20      THE WITNESS:  No, I agree.
21 BY MR. ERIKSEN
22    Q  But assuming there is, are you capable as it
23 relates to the conditions of this case is involved with
24 to make your own independent judgments about causation
25 and future care as a board certified specialist in

Page 171

1 rehabilitative medicine with another board
2 certification in brain injury medicine?
3    A  Yes.
4      MR. PEREZ:  Form.
5      THE WITNESS:  I believe that I am and
6 I've used the methodology that's been
7 accepted, that's been peer reviewed, published
8 and accepted which includes and is not limited
9 to using peer-reviewed, published articles.
10 BY MR. ERIKSEN
11    Q  Do you also make -- render an opinion in your
12 report that you believe that she's not going to be able
13 to reenter gainful employment; is that correct?
14      MR. PEREZ:  Form.
15      THE WITNESS:  That's correct.
16 BY MR. ERIKSEN
17    Q  What's the basis for that opinion?
18    A  The fact that she's a chronic pain patient
19 and she's going to have good days, bad days, missed
20 days of work, and she won't be able to do it on an
21 uninterrupted basis.
22    Q  And the chronic pain, does that relate
23 primarily to these horrific headaches that she has?
24    A  Traumatically induced headaches.
25      Are we done?

Page 172

1      MR. ERIKSEN:  We're done.
2      REDIRECT EXAMINATION
3 BY MR. PEREZ
4    Q  I just have one.
5    A  Make it real Goddamn quick.
6    Q  I just want to know what's the -- what's the
7 name of the board that certified you in brain injury
8 medicine?
9    A  As we've already said three times on this
10 deposition, the American Academy of Physical Medicine
11 and Rehabilitation has a subspeciality board which I
12 passed.
13      MR. PEREZ:  Okay, that's it.
14      THE REPORTER:  You read or waive, Doctor?
15      THE WITNESS:  Oh, no, I read this.  And
16 somebody owes me for another hour.  Who would
17 that be?
18      MR. PEREZ:  I didn't take that long.
19      (Whereupon, a brief discussion was
20    held off the record.)
21      THE REPORTER:  Regular delivery okay, ten
22 business days?
23      MR. PEREZ:  I need it sooner than that.
24      THE REPORTER:  When do you need it?
25      MR. PEREZ:  Can I get by the 22nd?  By

43 (Pages 169 to 172)

Page 173

```
 1    this Friday?
 2        MR. ERIKSEN:  If he's going to order it
 3    expedited, I assume I can get an un-expedited
 4    regular copy, right?
 5        THE REPORTER:  Regular copy, that's fine.
 6        MR. ERIKSEN:  I just don't want to pay --
 7    I had somebody charge me for an expedite that
 8    somebody else ordered.
 9        THE REPORTER:  He's getting billed the
10    expedite.
11        MR. ERIKSEN:  I just want to get a mini,
12    and I want the copies of -- I don't think I
13    need all the exhibits, but I need the
14    journals.  I need all of the Plaintiff's
15    exhibits.
16        (Whereupon, a brief discussion was
17        held off the record.)
18
19        (The deposition was concluded at 9:55
20        p.m., and the reading and signing having
21        not been waived.)
22
23
24
25
```

Page 174

```
 1         CERTIFICATE OF SHORTHAND REPORTER
 2
   STATE OF FLORIDA    )
 3                      ):SS
   COUNTY OF PALM BEACH )
 4
 5    I, the undersigned authority hereby certify
 6  that the foregoing transcript, Pages 1 through 173
 7  are a true and correct transcription of the
 8  deposition of DR. CRAIG H. LICHTBLAU, taken before
 9  me at the time and place stated in the caption
10  hereof.
11    I further certify that The Witness did not waive the
12  reading and signing of the deposition.
13    I further certify that I am not a relative, employee,
14  or attorney or counsel of any of the parties', nor am I a
15  relative or employee of any of the parties' attorney or
16  counsel connected with the action, nor am I financially
17  interested in the action.
18    IN WITNESS WHEREOF, I hereunto set my hand and
19  affix my official seal of office this 20th day of
20  February, 2018.
21
22        _____
23        ANDREA DENISE WEST, RPR, FPR
24
25
```

Page 175

```
 1              CERTIFICATE OF OATH
 2
   STATE OF FLORIDA
 3            :SS
   COUNTY OF PALM BEACH
 4
 5
 6
 7    I, the undersigned authority, certify that DR. CRAIG H.
 8  LICHTBLAU personally appeared before me and was duly sworn.
 9
10
11    WITNESS my hand and official seal this 18th day of
12  February, 2019.
13
14
15
16        _____
          ANDREA DENISE WEST, R.P.R.,F.P.R
17        Notary Public in and for
          the State of Florida
          My Commission No. FF 221415
18        Expires:  July 3rd, 2019
19
20
21
22
23
24
25
```

Page 176

```
 1
 2                JURAT PAGE
 3
 4  STATE OF FLORIDA       )
 5  ) :SS
   COUNTY OF MIAMI-DADE  )
 6
 7
 8    I, hereby certify that I have read the foregoing transcript
 9  Pages 1 to 173 and find the same to be true and accurate.
10
11
12    Any corrections made by me are set forth on the errata page
13  attached hereto.
14
15
16        _____
17  DR. CRAIG H. LICHTBLAU
18  Sworn to and subscribed before me on this ___ day of
19  _____, 2019.
20
21
22        _____
          Notary Public in and for the
23        State of Florida at Large.
          My Commission No.:
24        My Commission expires:
25
```

44 (Pages 173 to 176)

Page 177

1        JEANNIE REPORTING
          28 West Flagler Street, Suite 610
2              Miami, FL  33130
                (305) 577-1705
3

4    FEBRUARY 21, 2019

5    DR. CRAIG H. LICHTBLAU
      550 NORTHLAKE BOULEVARD
6    NORTH PALM BEACH, FLORIDA 33408

7    IN RE:
      FYLLING VS ROYAL CARIBBEAN
8    CASE NO:
      18-CV-21953-JEM
9

10   Dear DR. LICHTBLAU:

11   With reference to the examination of YOURSELF, deponent in
      the above-styled cause, taken on February 18, 2019 under
12   oath, please be advised that the transcript of the
      deposition has been transcribed and is awaiting your
13   signature.

14   Please arrange to conclude this matter at your earliest
      convenience.  We would suggest that you telephone this
15   office and arrange an appointment suitable for all
      concerned.
16

17   Sincerely yours,

18

19

20   _____
21   ANDREA DENISE WEST, RPR, FPR
      Certified Court Reporter
22

23   cc:  All Counsel of Record
24
25

ERRATA SHEET

F.R.C.P. RULE 1.310 provides in part:

(e)"...Any changes in form or substance that the witness

wants to make shall be entered upon a separate correction

page by the officer with a statement of the reasons given

by the witness for making them..."

PAGE/LINE     CHANGE/CORRECTION      REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

I, _____, do hereby certify that I have read the

foregoing transcript of my deposition, given on

_____and that together with any additions or

corrections made herein, it is true and correct.

_____

(Witness name)

JEANNIE REPORTING (305) 577-1705